## H. J. HEINZ COMPANY *v.* NATIONAL LABOR RELATIONS BOARD.

No. 73. Argued December 17, 18, 1940.—Decided January 6, 1941.

*Mr. Earl F. Reed*, with whom *Messrs. Roy G. Bostwick* and *Donald W. Ebbert* were on the brief, for petitioner.

*Assistant Solicitor General Fahy*, with whom *Solicitor General Biddle*, and *Messrs. Robert B. Watts, Laurence A. Knapp*, and *Mortimer B. Wolf* were on the brief, for respondent.

MR. JUSTICE STONE delivered the opinion of the Court.

Three questions are presented by the petition for certiorari in this case.

*First.* Whether there is support in the evidence for the finding of the National Labor Relations Board that petitioner has been guilty of the unfair labor practices

defined by § 8 (1) and (2) of the Act, interference with the exercise by its employees of their rights of self-organization guaranteed by § 7 of the Act, and more particularly interference with the formation and organization of a labor union of its employees.

*Second.* Whether the National Labor Relations Board exceeded its authority in ordering the disestablishment of a labor union in whose organization petitioner had interfered, and

*Third.* Whether the Board could validly find that petitioner's refusal to join with representatives of the labor organization authorized to represent its employees in collective bargaining, in signing a written contract embodying the terms of their agreement concerning wages, hours and working conditions, constituted a refusal to bargain collectively in violation of § 8 (5) of the Act, and whether the Board exceeded its authority in ordering petitioner to join in signing the agreement.

This is a proceeding brought by the National Labor Relations Board in the Court of Appeals for the Sixth Circuit to enforce the Board's order directing petitioner to cease certain unfair labor practices in which it found that petitioner had engaged, in connection with the organization of the Heinz Employees Association, a plant labor organization of petitioner's employees; to disestablish the Association; to recognize and bargain collectively with the Canning and Pickle Workers Local, Union No. 325, a labor organization affiliated with the American Federation of Labor; and to sign a written contract embodying any agreement which petitioner and the Union may reach respecting wages, hours and working conditions of petitioner's employees. The court of appeals confirmed the findings of the Board and directed compliance with the Board's order without modification. 110 F. 2d 843. We granted certiorari, 310 U. S. 621, the questions raised by the petition being of public impor-

tance in the administration of the National Labor Relations Act.

The Board found that during April and May, 1937, the two rival labor organizations, the Association and the Union, sought to organize petitioner's employees at its Pittsburgh plant. Petitioner's proposal that an election be held to determine which organization represented a majority of its employees was rejected by the Union which called a strike on May 24, 1937. The strike was ultimately settled by a written contract signed by petitioner, the Union, and the Association, which provided for an election, by the employees, under the supervision of a regional director of the National Labor Relations Board for the choice of an organization to represent them in collective bargaining. Meanwhile, and before the election, a majority of petitioner's two thousand employees at the Pittsburgh plant had signed petitions for membership in the Association, but upon the election held June 8, 1937, a majority of the employees cast their ballots for the Union. Petitioner has since recognized and bargained with the Union, but has refused to embody its agreement with the Union in a written contract.

Before the election the Union had lodged a complaint with the Board concerning the participation by petitioner in the attempted organization of the Association by petitioner's employees. The Board found that petitioner had been guilty of unfair labor practices by interfering in the organization of the Association, contrary to the Act. It found in detail that petitioner, through superintendent, foremen and other supervising employees, had interfered with, restrained and coerced its employees in the exercise of their rights to organize in violation of §§ 7, 8 (1) of the Act; that it had dominated and interfered with the formation of the Association and contributed to its support within the meaning of § 8 (2), and that it had refused to sign an agreement with the Union.

On the basis of these and subsidiary findings which need not now be stated, the Board made its order, the terms of which so far as now relevant have already been set forth.

*Petitioner's Responsibility for Unfair Labor Practices.* It is unnecessary to make a detailed examination of the evidence supporting the Board's findings respecting unfair labor practices both because the court below, after a thorough examination of the record has confirmed the Board's findings, and because of the nature of petitioner's contention with respect to them. Petitioner does not deny that there is evidence supporting the findings that petitioner's superintendent, during the organization campaign, upbraided employees for attending Union meetings, threatened one with discharge if he joined the Union, spoke to them disparagingly of the Union and directed some of petitioner's foremen to enroll the employees in the Association; or that there was evidence supporting the finding that a general foreman working throughout petitioner's Pittsburgh plant was active in disparaging the Union and its members to employees, and in urging them to repudiate the Union organization, or that three other foremen in charge of particular buildings or departments were active in dissuading employees from joining the Union. All three spoke disparagingly of the Union, one at a meeting of employees which he had called; and two were active in questioning employees concerning their labor union sympathies. Two of them threatened employees with discharge or loss of work or privileges if the Union were recognized.

There was also evidence that other foremen or forewomen in charge of large groups of employees engaged in similar activities; and that some solicited employees to join the Association; that one of the three foremen induced an employee to solicit signatures to the Association petition during working hours without loss of pay,

and suggested the names of other employees to aid in this work. There was also evidence that leaders or supervisors of employee groups were allowed to go about the plant freely during working hours and without loss of pay to solicit memberships in the Association which was done in the presence of the foremen.

Petitioner does not seriously dispute this evidence or challenge the findings of the Board summarizing it. The contention is that the activities of these supervisors of employees are not shown to have been authorized or ratified by petitioner; that following a complaint by a representative of the Union, about May 1st, one of petitioner's officers instructed the superintendent that the employees had a right to organize and that he wished the supervising force to understand that they should not be interfered with in any way in organizing, and that on May 21st the officer in question called a meeting of the supervisory force at which he gave like instructions; that there is no evidence of like activities after this time and that since the election petitioner has consistently recognized and bargained with the Union. From all this petitioner concludes that it is not chargeable with any responsibility for the acts of its supervisory employees and that consequently the evidence does not support the findings of unfair labor practices on its part, or justify the Board's order prohibiting petitioner; its officers and agents from interfering with the administration of the Association or contributing to its support.

Notwithstanding the knowledge from the start of some of petitioner's officers, of the organization campaign, and notwithstanding the unusual excitement and activity in petitioner's plant attending it, we assume that all were unaware of the activities of its supervisory staff complained of, and did nothing to encourage them before the complaint of their activities made by a representative of the Union about May 1st. At that time the cam-

paign for membership in the rival unions was at its height and resulted, as announced some three or four weeks later, in a majority of petitioner's employees signing as members of the Association.

It is conceded that petitioner's superintendent and foremen have authority to recommend the employment and discharge of workmen. It is in evidence that they can recommend wage increases and that the group leaders also issued orders directing and controlling the employees and their work, with authority to recommend their discharge. There is evidence supporting the Board's conclusion that the employees regarded the foremen and the group leaders as representatives of the petitioner and that a number of employees signed as members of the Association only because of the fear of loss of their jobs or of discrimination by the employer induced by the activities of the foremen and group leaders.

We do not doubt that the Board could have found these activities to be unfair labor practices within the meaning of the Act if countenanced by petitioner, and we think that to the extent that petitioner may seek or be in a position to secure any advantage from these practices they are not any the less within the condemnation of the Act because petitioner did not authorize or direct them. In a like situation we have recently held that the employer, whose supervising employees had, without his authority, so far as appeared, so participated in the organization activities of his employees as to prejudice their rights of self-organization, could not resist the Board's order appropriately designed to preclude him from gaining any advantage through recognizing or bargaining with a labor organization resulting from such activities. *International Association of Machinists* v. *National Labor Relations Board, ante,* p. 72. See *National Labor Relations Board* v. *Link-Belt Co., post,* p. 584.

The question is not one of legal liability of the employer in damages or for penalties on principles of agency or *respondeat superior*, but only whether the Act condemns such activities as unfair labor practices so far as the employer may gain from them any advantage in the bargaining process of a kind which the Act proscribes. To that extent we hold that the employer is within the reach of the Board's order to prevent any repetition of such activities and to remove the consequences of them upon the employees' right of self-organization, quite as much as if he had directed them.

This is the more so here where petitioner, when advised of the participation of his supervising employees in the organization campaign, took no step, so far as appears, to notify the employees that those activities were unauthorized, or to correct the impression of the employees that support of the Union was not favored by petitioner and would result in reprisals. From that time on the Board could have found that petitioner was as responsible for the effect of the activities of its foremen and group leaders upon the organization of the Association as if it had directed them in advance. The Board could have concluded that this effect was substantial, for it was in the succeeding three weeks that more than one-half of the majority of petitioner's employees who joined the Association signed their petitions for membership. We think there was adequate basis for the Board's order prohibiting petitioner, its officers and agents, from interfering with the exercise of its employees' rights of self-organization or with the administration of the Association or contributing to its support.

*The Order Disestablishing the Association.* What we have said of the unfair labor practices found by the Board, when considered with its unchallenged findings as to the relations of petitioner to the two unions, affords

the answer to petitioner's contention that the Board was without authority to compel disestablishment of the Association. Disestablishment is a remedial measure under § 10 (c) to be employed by the Board in its discretion to remove the obstacle to the employees' right of self-organization, resulting from the continued or renewed recognition of a union whose organization has been influenced by unfair labor practices. Whether this recognition is such an obstacle is an inference of fact to be drawn by the Board from all the circumstances attending those practices. *National Labor Relations Board* v. *Pennsylvania Greyhound Lines*, 303 U. S. 261; *National Labor Relations Board* v. *Newport News Shipbuilding & Dry Dock Co.*, 308 U. S. 241, 250.

Petitioner argues that as it has now recognized the Union and bargains with it, it should be equally free to recognize the Association instead of the Union whenever the former represents a majority of the employees. But in weighing this contention the Board could consider, as it did, that petitioner had failed to notify its employees that it repudiated the participation of its supervising employees in the organization of the Association and so has not removed the belief of the employees that petitioner favored and would continue to favor the Association and the employees joining it over others; that it had not mentioned the name of the Union in its bulletins announcing the terms of its agreement with the Union, and although it had reached an agreement with the Union had persistently refused to sign any written contract with it.

From this and other circumstances disclosed by the evidence, the Board inferred, as it might, that the influence of the participation of petitioner's employees in the organization of the Association had not been removed and that there was danger that petitioner would seek to take advantage of such continuing influence to renew

its recognition of the Association and control its action. This we think afforded adequate basis for the Board's order. *National Labor Relations Board* v. *Pennsylvania Greyhound Lines, supra; National Labor Relations Board* v. *Falk Corp.*, 308 U. S. 453, 461, 462; *National Labor Relations Board* v. *Link-Belt Co., post,* p. 584. Nothing in the order precludes members of the Association from establishing an organization independently of participation by petitioner and its officers and agents, and from securing recognition through certification of the Board or an election as provided by § 9 (c) of the Act.

*The Employer's Refusal to Sign a Written Agreement.* It is conceded that although petitioner has reached an agreement with the Union concerning wages, hours and working conditions of the employees, it has nevertheless refused to sign any contract embodying the terms of the agreement. The Board supports its order directing petitioner, on request of the Union, to sign a written contract embodying the terms agreed upon on the ground, among others, that a refusal to sign is a refusal to bargain within the meaning of the Act.

In support of this contention it points to the history of the collective bargaining process showing that its object has long been an agreement between employer and employees as to wages, hours and working conditions evidenced by a signed contract or statement in writing, which serves both as recognition of the union with which the agreement is reached and as a permanent memorial of its terms.[1] This experience has shown that refusal to

---

[1] Lewis L. Lorwin, The American Federation of Labor, p. 309; Commons and Associates, History of Labor in the United States, vol. II, pp. 179–181, 423–424, 480; Perlman and Taft, History of Labor in the United States, 1896–1932, vol. IV, pp. 9–10; Paul Mooney, Collective Bargaining, pp. 13–14; Twentieth Century Fund, Inc., Labor and the Government, p. 339.

Concerning the growth and extent of signed trade agreements, see National Labor Relations Board, Division of Economic Research

sign a written contract has been a not infrequent means of frustrating the bargaining process through the refusal to recognize the labor organization as a party to it and the refusal to provide an authentic record of its terms which could be exhibited to employees, as evidence of the good faith of the employer. Such refusals have proved fruitful sources of dissatisfaction and disagreement.[2] Contrasted with the unilateral statement by the employer of his labor policy, the signed agreement has been regarded as the effective instrument of stabilizing labor relations and preventing, through collective bargaining, strikes and industrial strife.[3]

Before the enactment of the National Labor Relations Act it had been the settled practice of the administrative agencies dealing with labor relations to treat the signing of a written contract embodying a wage and hour agreement as the final step in the bargaining process.[4] Congress, in enacting the National Labor Relations Act, had before it the record of this experience, H. Rept. No. 1147, 74th Cong., 1st Sess., p. 5, and see also pp. 3, 7, 15–18, 20–22, 24; S. Rept. No. 573, 74th Cong., 1st Sess., pp. 2, 8, 9, 13, 15, 17. The House Committee recom-

Bull. No. 4, Written Trade Agreements in Collective Bargaining, pp. 213–236; 49–209; U. S. Dept. of Labor, Bureau of Labor Statistics, Five Years of Collective Bargaining, pp. 5–7; Saposs and Gamm, Rapid Increase in Contracts, 4 Labor Relations Reporter No. 15, p. 6.

[2] Sumner H. Slichter, Annals of the American Academy (March, 1935), pp. 110–120; R. R. R. Brooks, When Labor Organizes, p. 224. Cf. Matter of Inland Steel Co., 9 N. L. R. B. 783, 796–797.

[3] Carroll R. Daugherty, Labor Problems in American Industry (Rev. ed. 1938), pp. 936–937; Mitchell, Organized Labor, p. 347; George G. Groat, An Introduction to the Study of Organized Labor in America (2d ed. 1926), pp. 337–339, 341, 345, 346; First Annual Report, National Mediation Board, pp. 1–2.

[4] The National Mediation Board administering the Railway Labor Act of 1926, as amended in 1934, 44 Stat. 577, 48 Stat. 1185, interpreted that Act which imposed a duty "to exert every reasonable

mended the legislation as "an amplification and clarifi-
cation of the principles enacted into law by the Rail-
way Labor Act and by § 7 (a) of the National Industrial
Recovery Act." H. Rept. 1147, *supra*, p. 3 and stated,
page 7, that §§ 7 and 8 of the Act guaranteeing collective
bargaining to employees was a reënactment of the like.
provision of § 7 (a) of the National Industrial Recovery.
Act, see *Consolidated Edison Co.* v. *Labor Board*, 305
U. S. 197, 236; *Labor Board* v. *Sands Mfg. Co.*, 306 U. S.
332, 342.

We think that Congress, in thus incorporating in the
new legislation the collective bargaining requirement of
the earlier statutes included as a part of it, the signed
agreement long recognized under the earlier acts as the
final step in the bargaining process. It is true that the
National Labor Relations Act, while requiring the em-
ployer to bargain collectively, does not compel him to
enter into an agreement. But it does not follow, as
petitioner argues, that, having reached an agreement, he
can refuse to sign it, because he has never agreed to sign
one. He may never have agreed to bargain but the'

---

effort to make and maintain agreements concerning rates of pay,
rules, and working conditions . . .," to require signed contracts.
See First Annual Report, National Mediation Board (1935), pp.
1–2, 36.

The National Labor Board, created to administer § 7 (a) of the
National Industrial Recovery Act, 48 Stat. 195, held that the duty
to bargain collectively imposed by that section included an obligation
to embody agreed terms in a signed trade agreement. See, Matter of.
Harriman Hosiery Mills, 1 N. L. B. 68; Matter of Pierson Mfg.
Co., 1 N. L. B. 53; Matter of National Aniline & Chemical Co.,
2 N. L. B. 38; Matter of Connecticut Coke Co., 2 N. L. B. 88.
See, also, Matter of Whittier Mills Co., Textile Labor Relations Board,
Case No. 34. Its successor, the first National Labor Relations Board
did likewise. See, Matter of Houde Engineering Co., 1 N. L. R. B.
(old) 35; Matter of Denver Towel Supply Co., 2 N. L. R. B. (old)
221; Matter of Colt's Patent Fire Arms Co., 2 N. L. R. B. (old) 155.

statute requires him to do so. To that extent his freedom is restricted in order to secure the legislative objective of collective bargaining as the means of curtailing labor disputes affecting interstate commerce. The freedom of the employer to refuse to make an agreement relates to its terms in matters of substance and not, once it is reached, to its expression in a signed contract, the absence of which, as experience has shown, tends to frustrate the end sought by the requirement for collective bargaining. A business man who entered into negotiations with another for an agreement having numerous provisions, with the reservation that he would not reduce it to writing or sign it, could hardly be thought to have bargained in good faith. This is even more so in the case of an employer who, by his refusal to honor, with his signature, the agreement which he has made with a labor organization, discredits the organization, impairs the bargaining process and tends to frustrate the aim of the statute to secure industrial peace through collective bargaining.

Petitioner's refusal to sign was a refusal to bargain collectively and an unfair labor practice defined by § 8 (5). The Board's order requiring petitioner at the request of the Union to sign a written contract embodying agreed terms is authorized by § 10 (c). This is the conclusion which has been reached by five of the six courts of appeals which have passed upon the question.[5]

<em>Affirmed.</em>

Mr. Justice McReynolds took no part in the consideration or decision of this case.

---

[5] *Bethlehem Shipbuilding Corp.* v. *National Labor Relations Board,* 114 F. 2d 930 (C. C. A. 1st); *Art Metals Construction Co.* v. *National Labor Relations Board,* 110 F. 2d 148 (C. C. A. 2d); *National Labor Relations Board* v. *Highland Park Mfg. Co.,* 110 F. 2d 632 (C. C. A. 4th); *Wilson & Co., Inc.* v. *National Labor Relations Board,* 115 F. 2d 759 (C. C. A. 8th); *Continental Oil Co.* v. *National*

*Labor Relations Board,* 113 F. 2d 473 (C. C. A. 10th). Contra, *Inland Steel Co.* v. *National Labor Relations Board,* 109 F. 2d 9 (C. C. A. 7th); *Fort Wayne Corrugated Paper Co.* v. *National Labor Relations Board,* 111 F. 2d 869 (C. C. A. 7th).