NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CASCADE EMPLOYERS ASSOCIATION, INC., Respondent.

No. 17012.

United States Court of Appeals
Ninth Circuit.

Oct. 20, 1961.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., and Earle W. Putnam, Attys., N.L.R.B., Washington, D. C., for petitioner.

Carney & McCarroll and Richard R. Carney, Portland, Or., amicus curiae.

Koerner, Young, McColloch & Dezendorf, Lewis K. Scott, Portland, Or., for respondent.

Before CHAMBERS and HAMLEY, Circuit Judges, and WOLLENBERG, District Judge.

WOLLENBERG, District Judge.

This case is before this Court on a petition of the National Labor Relations Board for the enforcement of its order pursuant to 29 U.S.C.A. § 160(e).

The Cascade Employers Association (hereinafter referred to as "Association") is a multi-employer, non-profit organization, which functions, *inter alia*, as the representative of its member firms in the negotiation of trade agreements with various labor unions, one of which is General Teamster's Local Union Number 324, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (hereinafter referred to as "Union"). For several years past the Union has maintained contractual relations with Association and its predecessor.[1]

 Jurisdiction of the N.L.R.B. was properly invoked under regulations established in October, 1958.[2]

1. Cascade Employers Association is the legal successor to the predecessor organization, Associated Concrete Products Manufacturers, Inc. (Record, p. 19)

2. Respondent Association contested the Board's jurisdiction by answer (Record, p. 12) on the ground that the business of each member of the Association may

The N.L.R.B. Trial Examiner found the respondent Association, at all times material, an employer within the meaning of § 2(2) of the National Labor Relations Act [29 U.S.C.A. § 152(2)] and the Teamster's organization the collective bargaining representative designated by a majority of the employees in the appropriate unit, under § 2(5) of the Act [29 U.S.C.A. § 152(5)].

On March 8, 1960, the N.L.R.B. issued its order in the instant matter, finding the respondent employers association guilty of an unfair labor practice, and ordering it to cease and desist and take certain affirmative action to effectuate the purposes of the National Labor Relations Act.[3]

On September 20, 1958, Alfred P. Blair, the Association's Executive Secretary, advised the Union by letter that the Association wished to terminate the agreement then in effect, as of its December 31, 1958 termination date, and the Union acknowledged and replied reciprocally at a later date. The parties set December 1, 1958, as their first contract conference.

Between December 1 and December 31, 1958, the Association and the Union met a total of four times. From the inception of negotiations the parties were in disagreement principally over the following:

1. The Association proposed the adoption of its own group insurance plan for health and welfare in substitution of the then presently operating program offered by the Union; the Union proposed an increase in employer payments under their plan for each employee of approximately $5.

2. The Association proposed termination of employer payments to the Teamsters Pension Program under the expiring agreement and a payment of 10 cents per hour be made directly to the employees instead.

3. The Association proposed that there be no increase in hourly pay rates during the forthcoming calendar year; the Union proposed an increase of 35 cents per hour in every classification.

4. The Union proposed that all premium work be assigned to the men with most seniority, competent to handle it, and that language in the contract which apparently permitted an employer, during slack periods, to lay off his employees without regard to seniority, be deleted.

The factual details of the negotiations, as found by the Trial Examiner, will be adopted here. Essentially, there is no major dispute over what occurred at the meetings which would alter the disposition of the matter here. The Association and the Union compromised certain matters of a minor nature, but were unable to agree on the major items, particularly the health and welfare benefits and wages. Some time subsequent to a negotiating session on December 16

---

not be aggregated when computing the volume of goods in interstate commerce. In general it may be said that the Board's jurisdictional standards, both in 1958 and today, contemplate as a proper procedure the taking into account of business of one or all of the members of a multi-employer bargaining unit to establish a dollar amount for jurisdictional determinations. Krist Gradis, 121 N.L.R.B. 601 (1958); Atlas Shower Door Co. v. N. L. R. B., 131 N.L.R.B. No. 2 (1961). The Court of Appeals for the Ninth Circuit has upheld the Board's jurisdiction in cases where the employers involved were members of a group of employers which bargained for a common labor contract.

N. L. R. B. v. Gottfried Baking Co., 210 F.2d 772 (2 Cir. 1954). On review, the findings of the Board on questions of fact will not be disturbed if supported by substantial evidence. 29 U.S.C.A. § 160(e) (as amended 1959). The Board's findings on the history of employer association bargaining and the existence of an employer bargaining association which represented the individual employers in negotiations are supported by substantial evidence and, therefore, a decision to invoke jurisdiction according to 1958 standards is proper. Siemons Mailing Service, 122 N.L.R.B. 81 (1958).

3. Cascade Employers Association, Inc., et al., 26 N.L.R.B. 1014 (1960).

and prior to December 26, 1958, the negotiating committee of the Association met and concluded to advise its members to take certain action in respect to working conditions then prevailing under the about-to-expire contract. In a special memorandum dated December 26, 1958, the negotiating committee of the Association advised its member employers as follows:

"Your negotiating committee in regard to the Teamsters and Engineers agreements have come to the conclusion that it will take some little time to finally come to terms with these two unions. Accordingly, we must have some plan under which to operate since we will have no agreement after December 31, 1958. Your committee makes the following recommendations:

"1. * * *

"3. That the copies of notices of conditions to be in effect January 1, 1959 should be posted on all bulletin boards of plants in the Salem area, and that copies should be sent to the homes of all affected employes. * * *

"5. * * * You will not be required to make Welfare Payments to the Teamster's Security Fund for January or thereafter. Instead you will make your contributions to the Cascade plan at your present rate of premium. On the Pension Program of the Teamster's be advised that you will make payment on the basis of earnings for December. This payment should be made as soon after January 31 as possible and no further payments should be made until further notice.

"It is the recommendation of your committee that all of the above noted conditions shall for the moment be confined to the Salem area and Independence. * * *

"It may be necessary, at some later date, to broaden the scope of this austerity program and if so, you will be advised."

The conditions of employment were as follows:

"(T)his company proposes to furnish work in so far as is possible after December 31, 1958 * * * under the following conditions providing that they are acceptable to you:

"1. All personnel of this company will be placed under the Cascade Employers Association Medical, Hospital and Insurance program effective January 1, 1959.

"2. Until such time as we are able to reach an agreement with both the Teamster's and Engineers Unions on the terms and conditions of a new labor agreement all employees under those classifications will be paid at the rate of * * * $2.00 per hour. Overtime will be paid for at the rate of time and one half time for hours over 40 per week only.

"3. All employees will be required to accept work assignments regardless of seniority or previous work jurisdiction.

"4. Whenever it shall be necessary to curtail operations all employees shall be put on a rotational basis regardless of previous seniority or work jurisdiction. * * *"

The memorandum and conditions of employment notices, sent out under the letterhead of the Association, were in the hands of the member employers prior to the last negotiating meeting between the Association and the Union on December 31, 1958. This meeting ended with no agreement over the major issues.

On January 1, 1959, the new employment conditions went into effect.

The N.L.R.B. Trial Examiner found, under these circumstances, that:

"The Respondent, by a course of conduct initiated shortly before December 30, 1958, and continued thereafter, which caused some of its employer members privy to a trade agreement * * * to post and distribute certain notices to employees,

and to institute, unilaterally, certain changes in the conditions under which they proposed to furnish work, engaged in a refusal to bargain collectively with a labor organization. * * * and thereby committed unfair labor practices within the meaning of section 8(a) (1) and (5) of the Act. * * *" [29 U.S.C.A. § 158(a) (1) (5)][4]

The Board's order adopts the findings, conclusions, and recommendations of the Trial Examiner, with certain exceptions, additions and modifications not pertinent in light of our disposition of the case. The Board, in discussing the remedy, stated:

"The Trial Examiner found, *inter alia*, that the Respondent Association violated Section 8(a) (5) and (1) of the Act [29 U.S.C.A. § 158(a) (5) (1)] by having caused its members unilaterally to change, on January 1, 1959, certain working conditions of their employees in the appropriate unit. These changes were: (1) substitution of a flat $2 an hour wage rate for all employee classifications, which in effect constituted an across-the-board wage cut, varying between 5 and 35 cents an hour, depending upon the classification affected; (2) Substitution of the Association's Welfare Plan for that of the Union; and (3) discontinuance of payments into the Union's Pension fund."[5]

The Board's order was as follows:

"Upon the entire record in this case, and pursuant to Section 10(c)

of the * * * Act [29 U.S.C.A. § 160(c)] * * * the * * * Board * * * hereby orders that the Respondent * * * shall:

"1. Cease and desist from:

"(a) refusing to bargain with * * * Union * * * with respect to rates of pay, wages, hours of employment, and other conditions of employment by instructing its member-employers * * * to effectuate unilateral changes in working conditions, or to solicit employees. * * *"[6]

Section 8(a) (5) [29 U.S.C.A. § 158 (a) (5)] provides that it shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees. The duty was first imposed upon employers by Congress in World War I and § 8(a) (5) is the outgrowth of the changes and refinements in our national labor policy today. As originally enacted, no good faith requirement was expressly set out; the extent of the obligation was undefined and there was no criteria for enforcement. Later, the National Industrial Recovery Act of 1933, § 7(a), [48 Stat. 198] provided that the employees shall have the right to bargain collectively through their representatives. The National Labor Relations Board concluded that this raised a duty on the part of the employer "to negotiate in good faith with his employees' representatives; to match their proposals if unacceptable, with counter-proposals; and to make every reasonable effort to reach an agreement." Houde Engineering Corp., 1 N.L.R.B. 35 (old) (1934).

4. 126 N.L.R.B. at 1030.

5. 126 N.L.R.B. at 1015. Respondent contends "(T)he Board's brief decision does not discuss the alleged violations other than to misstate the findings of the Trial Examiner * * * (quoting Board's Order and Decision as set forth above) * * * It is submitted that this misstates the Examiner's findings; he did not find a violation because of either item (2) or (3), but only as to item (1)." This contention is not supported by the Trial Examiner's report: "* * * The

record establishes that these fringe benefits of the employment relationship (referring to the Health and Pension plans) were modified in a context which tended to disparage Teamsters as the exclusive representative of the employees, and which subverted the mode of collective bargaining statutorily ordained." It is clear, therefore, that the Trial Examiner and the Board are relying upon the specific unilateral acts set forth in the Decision and Order.

6. 126 N.L.R.B. 1016, 1017.

The Wagner Act, enacted in 1935, contained section 8(5) which was thought of as enacting the Houde Engineering principle into law.[7] The Act did not, however, define the obligation.[8] The N.L.R.B. and the courts, in applying the Act, however, interpreted it to require bargaining in good faith. N.L. R.B. v. Reed & Prince Mfg. Co., 205 F.2d 131 (1st Cir. 1953), cert. denied 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); N.L.R.B. v. Montgomery Ward & Co., 133 F.2d 676, 146 A.L.R. 1045 (9th Cir. 1943). In 1947 § 8(d) was added to the Act [29 U.S.C.A. § 158(d)], which was declaratory of the judicial construction of the good faith rule under § 8(a) (5) [29 U.S.C.A. § 158(a) (5)]. Reed & Prince, supra.

In determining whether an unfair labor practice has been committed in the situation that this case presents, the Board must inquire into the "totality of the employer's conduct." Reed & Prince Mfg. Co., supra. To make a determination that an employer has committed an unfair labor practice on the basis of one action without inquiring into the totality of the conduct of the negotiations and making a finding concerning the employer's state of mind, is generally termed applying a *per se* rule to determine whether an unfair labor practice has been committed. While there are some situations where such conduct could be, without more, a violation of § 8(a) (5) [29 U.S.C.A. § 158(a) (5)], those cases have proceeded on the basis that the act in question was a clear manifestation of an employer's state of mind and showed, therefore, a lack of good faith. N.L.R.B. v. Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949); H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 (1941). Where

as here, the acts complained of are not such as standing alone will justify such an inference, the Board must take into account the state of mind of the employer by investigating the totality of the circumstances.

The applicable rule for the Board's finding under § 8(a) (5) [29 U.S.C.A. § 158(a) (5)] and § 8(d) [29 U.S.C.A. § 158(d)] was set out in National Labor Relations Board v. Insurance Agents, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). While the case presented its opinion in terms of § 8(b) (3) [29 U.S. C.A. § 158(b) (3)] of the National Labor Relations Act, that section is the corollary of § 8(a) (5) [29 U.S.C.A. § 158(a) (5)].[9]

Speaking for the Court, Justice Brennan said:

"The Board's view is that irrespective of the union's good faith in conferring with the employer at the bargaining table for the purpose and with the desire of reaching agreement on contract terms, its tactics during the course of the negotiations constituted *per se* a violation of § 8(b) (3) [29 U.S.C.A. § 158(b) (3)]. Accordingly, as is said in the Board's brief, 'The issue here * * * comes down to whether the Board is authorized under the Act to hold that such tactics * * * support a finding of a failure to bargain in good faith as required by Section 8(b) (3) [29 U.S.C.A. § 158(b) (3) ].' "[10]

"We believe that the Board's approach in this case—unless it can be defended, in terms of section 8 (b) (3) [29 U.S.C.A. § 158(b) (3)], as resting on some unique character of the union tactics involved here—must be taken as proceeding from an erroneous view of collective bargaining."[11]

7. See Senator Wagner's remarks at 79 Cong.Rec. 7571 (1935).

8. N.L.R.A. c. 372 § 8(5), 49 Stat. 453 (1935).

9. National Labor Relations Board v. Insurance Agents, 361 U.S. 477, 80 S.Ct. 419 (1960).

10. 361 U.S. at 482, 80 S.Ct. at 423.

11. 361 U.S. at 488, 80 S.Ct. at 426.

48

Mr. Justice Frankfurter, concurring, stated:

"I agree that the position taken by the Board here is not tenable. In enforcing the duty to bargain the Board must find the ultimate fact whether, in the case before it and in the context of all its circumstances, the respondent has engaged in bargaining without the sincere desire to reach agreement which the Act commands. * * * What the Board has in fact done is lay down a rule of law that such conduct * * * necessarily betokens bad faith in the negotiations. * * * From the conduct of its counsel before the Trial Examiner, and from its opinion, it is apparent that the Board proceeded upon the belief that respondent's tactics were, without more, sufficient evidence of a lack of a sincere desire to reach agreement to make other consideration of its conduct unnecessary. For that reason the case should be remanded to the Board for further opportunity to introduce pertinent evidence, if any there be, of respondent's lack of good faith."[12]

■ Applying this to the case at hand it is seen that in order to determine whether the respondent has bargained with the requisite good faith, the Board may not condemn the action by itself, but must, if it is to determine intent, inquire into the totality of circumstances surrounding the bargaining. Where the Board has done so, a reviewing court will not lightly disregard the over-all appraisal given by an agency " * * * equipped * * * by experience to deal with a specialized field of knowledge * * * [and] whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." Universal Camera Corp. v. Labor Board, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). From a reading of the decision of the Board it is apparent that it has ad-

hered to the rejected *per se* rule in this case. Nowhere is there a finding concerning the respondent's state of mind based upon a "totality of the evidence." Therefore, in view of the holding in Insurance Agents, supra, and, more recently, followed in Katz v. N.L.R.B., 2 Cir., 289 F.2d 700 (1961) we would remand the case to the Board in order that it may take action consistent with Insurance Agents.

■ The Board, on July 31, 1961, in Hoisting & Portable Engineers Local No. 701, 132 N.L.R.B. No. 44, has found that Cascade Employers Association, Inc., is not an established appropriate multi-employer bargaining unit. This is contrary to its finding in its Decision and Order dated March 8, 1960, in the instant case (see 126 N.L.R.B. 1014). Under these circumstances, the Board must reconsider its findings in this regard.

---

12. 361 U.S. at 504, 518, 80 S.Ct. at 435.