300 F.2d 273
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HOUSTON CHRONICLE PUBLISHING COMPANY, Respondent.
Clayte BINION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Zeena JACKSON, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 19017, 19201, 19247.
 United States Court of Appeals Fifth Circuit.
 March 9, 1962.
 
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Judith Bleich Kahn, Melvin J. Welles, Attys., Stuart Rothman, Gen. Counsel, Frederick U. Reel, Atty., N.L.R.B., Washington, D.C., for National Labor Relations Board.
 Charles R. Vickery, Jr., Liddell, Austin, Dawson & Sapp, Houston, Tex., for Houston Chronicle Pub. Co.
 Jack Binion, Houston, Tex., for Clayte Binion.
 W. V. Ballew, Jr., Houston, Tex., for Zeena Jackson.
 Before TUTTLE, Chief Judge, and HUTCHESON and JONES, Circuit Judges.
 HUTCHESON, Circuit Judge.
 
 
 1
 This case is before us upon a petition of the National Labor Relations Board, hereinafter referred to as the Board, for enforcement of two board orders directed to the Houston Chronicle Publishing Company, hereinafter referred to as the Chronicle, pursuant to Section 10(e) of the National Labor Relations Act.[1]
 
 
 2
 The principal question in the case is whether the Chronicle will be required to recognize and bargain with the Houston Newspaper Guild, Local 113, of the American Newspaper Guild AFL-CIO, hereinafter referred to as the Union.
 
 
 3
 It is the position of the Board that in refusing to do so, as the Chronicle admittedly has, and in interfering, restraining and coercing its employees in the exercise of their rights under the National Labor Relations Act, by interrogating them and threatening them in connection with their union activity, the Chronicle is guilty of unfair labor practices which demand for their correction compliance with the orders which the Board has issued.
 
 
 4
 The Chronicle, on the other hand, maintains that it is under no obligation to recognize the Union as bargaining representative of its employees because false and misleading election campaign propaganda promulgated by the Union nullified the results of the representation election which led to certification of the Union. The alleged interference with employees' rights, the Chronicle contends, was merely the emotional and unauthorized outburst of a minor supervisory employee, and not of such gravity as to merit issuance of a cease and desist order.
 
 
 5
 On July 29, 1959, a petition requesting certification as the representative of all non-supervisory employees in the Chronicle's Editorial Department was filed by the Union with the Board. On August 27, 1959, the Chronicle and the Union, with Board approval, entered into a stipulation for certification upon a consent election, with pre-election hearing waived. The agreed bargaining unit was composed of all non-supervisory employees of the Editorial Department whose names appeared on a payroll list as of August 27th, which list was attached to the stipulation. The date of the election was October 15, 1959.
 
 I.
 
 6
 Two days before the election, a letter signed by the international representative of the American Newspaper Guild was mailed to each of the voters in the bargaining unit. It was but one of a series of messages circulated by both management and labor as part of the campaign waged by both to influence the results of the forthcoming election. Among the assertions contained in the Union letter of October 13th were the following:
 
 
 7
 'Our statistician has answered a question quite a few people have been asking recently. It concerns the actual salary of a guild employee if you include the fringe benefits provided under a contract. We have taken a San Antonio Light reporter who has worked for the paper five and one-half years and have assumed he has no merit increase. His base salary is the top minimum of $115 per week. This is the way it breaks down by the year--
 
 
 8
 " $5,980.00 Yearly salary
" 172.00 Holiday pay (actually double
 time and a half)
" 345.00 Vacation pay
" 539.00 Sick pay, insurance and
 hospitalization
" 1,265.00 Severance and retirement
 benefits
" 520.00 Night differential
 ---------
" 8,821.50 Total Yearly Salary
 
 
 9
 'That yearly figure breaks down to $168.50 per week, and you'll notice it does not include such items as overtime at time and a half cash, higher pay for work in higher classifications, or expenses such as cab fare and the like.'
 
 
 10
 'You might be interested to know a bit of the law concerning unilateral pensions. The company would be in violatin of the law if they withdrew it in a discriminatory manner, according to the Treasury Department. In other words, every editorial employee would lose the pension, from the editor down to the copy boys. Any withdrawing it from the editorial department because of the Guild would be discrimination also, the department said, adding it would have to be withdrawn from advertising, circulation, and business office as well. The department concluded that sizeable monotary penalties were levied in the event of violation of the pension and trust laws.'
 
 
 11
 On October 14, 1959, the day before the election, the Chronicle sent a telegram to editorial department employees challenging the assertions in the Union letter. The telegram said:
 
 
 12
 'On page 9 of today's Guild letter, some figures for the San Antonio Light are quoted. The figures purport to show that a person on the Light received a total of $8,821.50 remuneration from a base pay of $5,980. This is absured and an insult to your intelligence. The yearly salary is accurate. A reduced staff is used on holidays and no extra holiday pay is paid unless the holiday is worked. Vacation pay is part of the yearly salary figure. Not an extra. Everyone on the Light is required to take his vacation. Sick pay is determined solely by the Company on an individual basis. It can be as little as a day or up to two weeks or longer, based on the recommendation of the department head. The Light does not pay you extra for being sick. According to the overall Hearst Guild contract, the Light provides severance pay of 12 weeks base pay for a 5-year man, but he must quit or be discharged for cause other than dishonesty to get it. The Light through custom, not contract, pays $1 per day extra for editorial employees reporting for work after 3:30 P.M. or $2.00 per day extra for those reporting for the 2:20 A.M. shift.
 
 
 13
 'This information was obtained from Mr. E. J. Redlinger, business manager and chief accountant of the San Antonio Light. On page 3, paragraph 5, the Guild states the Chronicle cannot arbitrarily withdraw any working conditions you now have. All is subject to bargaining to which the Chronicle is just as much a party as the guild, and the Guild's only weapon, to strike. You have been cautioned to watch out for last minute misleading propaganda efforts. My letter of October 8 seems to have stimulated some. Please read your Guild letter carefully. Let me repeat. Dont's be stampeded. Do your own deciding. Come to the polls and vote.'
 
 
 14
 The election resulted in a vote of fifty-four for the Union and fifty against it, with five challenged votes cast. Pursuant to Board orders, three of the challenged votes were later openedand counted, changing the result to fifty-four for the Union and fifty-two against.
 
 
 15
 Among the several timely objections leveled at the election by the Chronicle was included a charge that the statements of the Union set out at length in the text above were deliberately false, inaccurate, and misleading; that they constituted an interference with a fair election which the employees in the unit were in no position to evaluate; and that as a result, the election should be set aside.
 
 
 16
 The Board's Regional Director concluded that these objections did not raise substantial and material issues and recommended that they be overruled. The Board agreed with the recommendation of the Regional Director; ultimately, the order directing bargaining upon request, which we are here asked to enforce, was issued.
 
 
 17
 In passing on the Chronicle's objections to the Union letter, the Regional Director first considered the explanation of the letter's contents offered by its author This exegesis reveals that what was represented as the 'actual salary of a guild employee if hyou include the fringe benefits' was actually insofar as fringe benefits were included in stated amounts, the hypothetical salary which would be paid to a hypothetical employee only in the highly unlikely event of the occurrence of a certain hypothetical pattern of employment.[2] The editorial employees for whose ostensible elucidation the 'actual salary' breakdown was prepared by the Union were not enlightened with the information that the monetary values assigned to various fringe benefits were in reality merely hypothetical, conjectural, and speculative. In contrast, certain other patently variable data were specifically and pointedly excluded from the computation in a show of fairness and objectivity. The misleading effect of this tactic and the distortion of the whole presentation of comparative salary data is apparent.
 
 
 18
 The Director next considered the telegram sent by the Chronicle to employees in the unit, which is copied verbatim in the text above. Conceding that: '(The Union's) claim that various possible benefits should be included in computing the total yearly salary could be misleading and may not be completely accurate'; that the claims 'may be speculative and even exaggerated'; and that the letter contained 'half truths or misrepresentations', he nonetheless concluded that the Union representations were not of such character as to require setting aside an election under the Board's Celanese Corp. of America text,[3] and he recommended that the objection be overruled. His reasons were: (1) proceeding from the assumption that the terms 'severance pay' and 'extra holiday day' 'have a general meaning which is commonly understood, particularly in an industry concerned with communications by means of the printed word', editorial employees 'would surely understand' the conditions under which severance and retirement benefits are paid and double time and a half would be received for holiday work; that is, the employees would be aware of the unstated premises underlying the Union presentation of the severance and retirement benefits and holiday pay to be received under a union contract; (2) the Union claims 'in most instances involve interpretations of the contract-- something the Board will not do'; (3) the telegram from the Chronicle specifically corrected the helf truths or misrepresentations in the Guild's letter; and (4) 'Editorial employees of a newspaper are required to approach all matter with a critical eye for the facts and are accustomed to practice discernment in evaluating the validity of conflicting claims'.
 
 
 19
 With respect to the Union declarations relative to the legal effect of withdrawal of unilateral pension plans, the Director asserted that: 'The telegram of October 14 informed employees of the Chronicle's position as to its retirement plan. This is not a subject within the (Union's) special ambit nor is it in an authoritative position to know the true facts'.
 
 
 20
 The Board, on the entire record in the case, adopted the report of the Regional Director, and finding that the Chronicle's objections and exceptions did not raise any issues of law or fact which would warrant reversing him, overruling the objections and denied a hearing thereon.
 
 
 21
 After refusal by the Chronicle to bargain with the Union, an unfair labor practice charge was filed, and a hearing, wherein the objections previously directed to the election were again urged as justification, was held before a trial examiner. The report of the latter merely reviewed the findings of the Regional Director, and concluded that especially in view of the high level of intelligence of editorial employees, and in light of the fact that the Chronicle had 'dispatched a telegram disputing the validity of the Union's computation * * * and assertions in respect to the legal consequences attending a withdrawal of pension benefits', the Union letter did not exceed the bounds of permissible campaign propaganda. He found that the Chronicle was guilty of failure to bargain in good faith, and recommended issuance of an order directing it to bargain upon request. In its decision the Board noted its previous disposition of the Chronicle's objection to the letter, adopted the report of the trial examiner, and issued the order which he recommended.
 
 
 22
 In determining whether the Board properly evaluated campaign propaganda, we accept the Board's findings of fact so long as they are supported by substantial evidence on the record considered as a whole. This is the test prescribed by 29 U.S.C.A. 160(e) and Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1952). See also Celanese Corporation of America v. National Labor Relations Board, 291 F.2d 224 (7th Cir.), cert. denied 368 U.S. 925, 82 S.Ct. 360, 7 L.ed.2d 189 (1961); N.L.R.B. v. Dallas City Packing Co., 251 F.2d 663, 666 (5th Cir. 1958). The cases cited to us by the Board in support of the proposition that our review is limited to determination of whether the Board acted arbitrarily or capriciously, viz., N.L.R.B. v. Dallas City Packing Co., supra; N.L.R.B. v. National Truck Rental Co., 99 U.S.App.D.C. 259, 239 F.2d 422, 425-426 (1956), cert. denied 352 U.s. 1016, 77 S.Ct. 561, 1 L.Ed.2d 547; N.L.R.B. v. National Plastic Products Co., 175 F.2d 755, 758 (4th Cir. 1949), in fact support the ivew we take here. Semi-Steel Casting Co. v. N.L.R.B., 160 F.2d 388, 391 (8th Cir. 1947), cert. denied 332 U.S. 758, 69 S.Ct. 57, 92 L.Ed. 344 is inapposite.
 
 
 23
 The burden of proving that the election was unfair was, of course, upon the Chronicle. N.L.R.B. v. Huntsville Manufacturing Co., 203 F.2d 430 (5th Cir. 1953). Both the Chronicle and the Union presented evidence in support of their respective positions at every opportunity. After considering this evidence, the Board concluded that the Chronicle was not justified in its refusal on the basis of its obligations to the election to bargain with the Union and, implicitly, that the election was fairly conducted. It follows from what we have said above that the question we are called upon to answer is whether the Board's conclusion is supported by substantial evidence.
 
 
 24
 In election proceedings, it is the function of the Board to provide 'a laboratory' in which an experiment to determine the uninhibited desires of the employees may be conducted under conditions as nearly ideal as possible. When and if the standards of election campaigning drop too low, the requisite laboratory conditions are not present, and the experiment must be conducted over again. General Shoe Corporation, 77 NLRB No. 18, 21 LRRM 1337, 1341 (1948). Thus, in a case where election propaganda is challenged by a party to the election, the ultimate question before the Board is whether the propaganda has lowered the standards to the point where it may be said that the uninhibited desires of the employees cannot be determined from the election. Gummed Products Co., 112 NLRB, No. 141, 36 LRRM (1955). Those influences, regardless of their truth or falsity, which make impossible an impartial test, are grounds for invalidation of an election. Continental Oil Co., 58 NLRB No. 169, 15 LRRM 30 (1944).
 
 
 25
 When the basis of a challenge to propaganda is that it is false and misleading, the Board does not as a general rule undertake to police and censor the utterances of the parties, absent fraud or coercion. N.L.R.B. v. Dallas City Packing Co., supra; Kawneer Co., 119 NLRB No. 185, 41 LRRM 1333 (1958). However, when a party deliberately makes material misrepresentations of fact in circumstances in which employees are unable to evaluate the truth or falsity of the assertions, the Board has held that the legitimate bounds of campaign propaganda have been exceeded and has set aside the election. E.g., Cleveland Trencher Co., 130 NLRB, No. 59, 47 LRRM 1371 (1961); The Caldyne Co., 117 NORB, 1026, 39 LRRM 1364 (1957). That the misrepresentation be deliberate is not required in every case, for: 'in any event the effect on * * * employees * * * would be no different from that of a deliberate misstatement'. Kawneer Company, supra. As a guide to determining whether employees could evaluate propaganda, the Board frequently considers (1) whether the promulgating party had special knowledge of the facts asserted, thus making it more likely that the employees would rely on them; and (2) whether the challenging party had the opportunity to or did rebut the false assertions. Celanese Corporation of America, 121 NLRB No. 42, 42 LRRM 1354 (1958). These, of course, are merely useful factual tests for ascertaining whether the legal standards have been trnasgressed; that is, whether the effect of circumstances surrounding an election was such that the results of the election reflect the desires of the employees, free of improper influence.
 
 
 26
 In this case, the Board has made no specific findings, labelled as such, that the Union representations to which the Chronicle objects were or were not false. It has, however, adopted the findings of the Regional Director that the representations were 'not completely accurate; speculative; exaggerated; helf-truths; misrepresentations'. The fact that some of them were based upon unstated hypotheses does not lighten the impact of the deception. See Reiss Associates, 116 NLRB No. 26, 38 LRRM 1218 (1956). The form of presentation employed by the Union is in and of itself misleading, in addition to the effect of substantive inaccuracies which it may embody. Ibid. The representations with which we are here concerned were neither 'inadvertently inaccurate' nor 'substantially correct', as were those which the Board considered in Otis Elevator Co., 114 NLRB No. 234, 37 LRRM 1199 (1955).
 
 
 27
 Turning our attention to the question of whether the Union had superior knowledge sufficient to inspire the reliance of the employees, we think that the only inference which could be drawn from the facts was that it did. With respect to wage rates under a Union contract with another employer, its superior position of knowledge is indisputable; with respect to the law relating to the withdrawal of unilateral pensions, while the Union may not actually have had superior knowledge (and this was obviously the case), it purported to have it by virtue of information received from teh Treasury Department. We can see no difference in effect on the minds of the employees than if the Union had actually been fully conversant with Treasury Regulations to the certain knowledge of those reading the Union letter. In this regard, it may be observed, in addition, that employees would normally expect a union to be familiar with the law relating to terms of employment such as pension plans.
 
 
 28
 Rather than detracting from the authority with which the Union assertions were imbued, the attempted rebuttal by the Chronicle only served to reinforce their strength and authority. When the Union declared the benefits to be obtained from a Union contract, its presentation was precise, and in terms of dollars and cents. the reply of the Chronicle was nothing more than an ineffectual attempt to demonstrate the falsity of the Union claims by attacking some of the unstated premises on which they rested. The weakness of such an attack is obvious: the conclusion attacked may be valid on still another unstated premise. There was simply no way by which the Chronicle telegram could destroy the overall effect of the misleading Union representation. When the Union purported to explain the law relative to the legal effect of withdrawal of unilateral pension plans, the Chronicle merely replied that: 'All is subject to bargaining, to which the Chronicle is just as much a party as the Guild, and the Guild's only weapon, to strike.' This does not constitute rebuttal, in our view.
 
 
 29
 In the light of the fact that the Union letter was delivered to the employees on the day before the election, we do not think that it can be said that the Chronicle failed to do all that it could have done in the time remaining before the election to correct the impression created by the Union. Its efforts were nonetheless ineffective to dispel that aura of unfairness. We are, moreover, unable to perceive any evidence in the record from which the conclusion could be drawn that the employees in the Editorial Department had such intelligence, or such experience with the matters dealt with as to enable them to evaluate with more perspicuity than any other class of employees the truth or falsity of campaign propaganda, and consequently reject this notion which was given so much weight by the Board in support of its ultimate findings.
 
 
 30
 To ignore the fact that all election campaigns are to some extent accompanied by imprecise remarks and unprovable predictions should one side or the other prevail would be to ignore reality. The same court, however, which alliteratively observed that election publicity is characterized by 'prattle rather than precision', Olson Rug Co. v. N.L.R.B., 260 F.2d 255, 257 (7th Cir. 1958), later pointed out as well that all that is said in an election campaign is not prattle. See Celanese Corp. v. N.L.R.B., 279 F.2d 204 (7th Cir.) cert. denied 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 189 (1951). Purportedly authoritative and truthful assertions concerning wages and pensions of the character of those made in this case are not mere prattle; they are the stuff of life for Unions and members, the selfsame subjects concerning which men organize and elect their representatives to bargain. We repeat for emphasis: 'An election can serve its true purpose only if the surrounding conditions enable employees to register a free and untrammeled choice for or against a bargaining representative.' National Labor Relations Board v. Trinity Steel Company, 214 F.2d 120 (5th Cir. 1954).
 
 
 31
 The Chronicle has established a prima facie case of unfairness in the conduct of this election, and on the record taken as a whole there is not substantial evidence in support of a contrary conclusion. For this reason enforcement of the Board order directing the Chronicle to bargain upon request will be denied.
 
 II.
 
 32
 The admitted action of the Chronicle's Chief Photographer in repeatedly interrogating and threatening Union officers and members in connection with their union activities during the period February-May 1960 was clearly in violation of Section 8(a)(1) of the National Labor Relations Act. It is indisputable that he was a supervisor within the meaning of the Act, and in a position to give his subordinates cause to believe he was acting for management; his action was, therefore, attributable to the Chronicle. See International Association of Machinists, Tool and Die Makers Lodge No. 35 v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50 (1940); H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 521, 61 S.Ct. 320, 85 L.Ed. 309 (1941). The Board order directing the Chronicle to cease and desist and to post appropriate notices will accordingly be enforced as written.
 
 III.
 
 33
 Our disposition of No. 19,017 has rendered unnecessary consideration of the points raised in Nos. 19,201 and 19,247, and they are hereby dismissed.
 
 
 34
 Enforcement of order to bargain upon request denied; order to cease and desist enforced; petitions in Nos. 19,201 and 19,247 dismissed.
 
 
 
 [1]
 61 Stat. 136, 29 U.S.C.A. 151 et seq
 
 
 [2]
 The Regional Director stated in his report:
 'Actually it is not probable that an employee would get $345.00 in lieu of a vacation. However, if the situation envisioned by the (Union) actually occurred, it could be decided through grievance procedure. The Board would not anticipate the actions or speculate as to merits of positions. There is only one employee regularly working nights on the San Antonio Light. A 'night differential' is not paid during vacation, so that is exaggerated by $30. The (Union) contends that overtime over a period of years might result in additional compensation although the exact amount would be variable and subject to speculation.'
 
 
 [3]
 121 NLRB No. 42, 42 LRRM 1354 (1958)