474 F.2d 1352
 83 L.R.R.M. (BNA) 2044, 71 Lab.Cas. P 13,613
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
National Labor Relations Board, Petitioner
v.
Summit Tooling Company, Division of Ace Tool Engineering
Company, Inc., Respondent
 No. 72-1325.
 United States Court of Appeals, Seventh Circuit.
 March 30, 1973.
 
 Before SWYGERT, Chief Judge, DUFFY, Senior Circuit Judge, and STEVENS, Circuit Judge.
 
 Order
 
 1
 This suit is before the court upon the application of the National Labor Relations Board (Board) for enforcement of its order.[1]
 
 
 2
 The alleged unfair labor practices occurred in South Bend, Indiana where the Company (respondent Summit) engaged in the manufacture of tools and dies.
 
 
 3
 The Board findings concluded (1) that the Company violated Section 8(a)(5) and (1) of the National Labor Relations Act (Act) by refusing to sign an agreed contract, and by failing to supply the Union[2] with necessary information needed for the proper maintenance of the contract; (2) that the Company violated Section 8(a)(3) and (1) of the Act by discriminatorily terminating four employees (Parks, Pelka, Schaunaman and Rosin) because of their Union membership and activities; (3) that a further violation of Section (8)(a)(5) and (1) was realized by the refusal of the Company to discuss or bargain with the Union about the effects of the plant closure of Summit by the owner.
 
 
 4
 Respondent herein is a subsidiary of Ace Tool Engineering Company, which is also located in South Bend and occupies the same premises. Walter Milovich was the president of both companies. He and other members of his family own all of the shares of stock in the two corporations.
 
 
 5
 The Union, since 1956, has been the exclusive bargaining representative of the Company's employees engaged in the manufacture of tools and dies. Several collective bargaining agreements had been successfully negotiated and executed since Union representation commenced; the last one executed in 1965 covered the period from April 1966 to September 1969.
 
 
 6
 During July and August 1969, the Company and the Union had three or four negotiating sessions which culminated with a Memorandum of Agreement signed by the representatives of management and of labor. This memo provided for the execution of a collective bargaining agreement with an effective date of September 15, 1970.
 
 
 7
 The Memorandum of Agreement also contained the stipulation to the effect that "This will serve as a letter of understanding between the Company and the Union as to the collective bargaining agreement, effective September 1, 1969, until the formal contract can be completed and signed ...". The Union agreed to supply Milovich with a formal contract for his signature incorporating the terms of the agreement.
 
 
 8
 Under the agreement, the parties agreed that certain Lincoln Life Insurance Pension and Group Health Insurance Plans effective in the previous contract would be continued and incorporated in the new contract. The agreement provided for Company contributions to the pension fund for the first time at the rate of six (6) cents per hour of work on or after September 3, 1969. The employees were to contribute at the rate of $5 per week as they had done since 1967.
 
 
 9
 In the Memorandum Agreement, the Company agreed it would submit monthly contributions to the designated insurance company and that a union trustee would receive a copy of the Company's monthly reports.
 
 I.
 
 10
 The following evidence was adduced at the proceedings before the Trial Examiner pertaining to the Section 8(a)(5) violations of failure to supply necessary information pursuant to a contracted obligation and refusing to sign a previously agreed contract.
 
 
 11
 Employee Parks was elected Union trustee in October, 1969. Immediately thereafter, he contacted the local representative of the insurance company providing the pension plan and health benefits regarding the expected contributions of the Company to the plan. The insurance representative asserted that he was not in possession of the information and for the next two months, despite repeated attempts by Parks, he failed to supply the information.
 
 
 12
 On December 1, 1969, Union business representative Downey contacted the insurance company and orally requested the reports of employer contributions from the representative. The reports were not supplied. Downey then wrote a letter to the insurance representative and Milovich on December 20, 1969 requesting the same information before January 8, 1970 the date mutually set for submission of the formal contract. On January 7, 1970 Downey was in receipt of a letter from the insurance company which informed him that Milovich was in possession of the requested information and that any requests with respect thereto should be directed to the Company. The testimony of the insurance representative before the Trial Examiner revealed that Milovich instructed the representative "not to give this information to the Union" in January and April 1970.
 
 
 13
 On January 8, 1970, Downey presented the final draft of the contract to Milovich for his signature. Milovich refused to sign the contract as submitted contending that some mistakes were evident in the final draft. Although Downey asked Milovich to indicate what errors were present, Milovich refused to elaborate. At the same time, Downey inquired about Milovich's contributions to the pension fund, Milovich evaded the issue during the remainder of their conversation.
 
 
 14
 Downey on two other occasions tendered the contract to Milovich for his signature to no avail. On March 6, 1970 Downey wrote to Milovich requesting clarification of any alleged errors. Milovich never replied and never signed the contract.
 
 
 15
 We agree with the conclusion of the Board that the failure of the Company to provide information of employer contributions to the pension fund to the Union from October 1969 to May 1970 which information the employer was obliged to provide pursuant to the Memorandum of Agreement constituted a violation of Section 8(a)(5) of the Act.[3] It is elementary that an employer is under a general obligation to supply information needed by a bargaining representative for the proper performance of his duties. NLRB v. Acme Industrial Co., 385 U.S. 432 (1967). Furthermore, in the case at bar, the employer was admittedly under a contractual duty to supply such information.[4]
 
 
 16
 In addition, upon considering the foregoing evidence, we are of the opinion that ample evidence was adduced to establish a 8(a)(5) violation for Milovich's failure to sign the previously negotiated collective bargaining agreement. See H.J. Heinz Co. v. NLRB, 311 U.S. 514 (1941); NLRB v. Strong d/b/a Strong Roofing & Insulating Co., 393 U.S. 357 (1969).
 
 II.
 
 17
 We are of the opinion that there was ample evidence in the record of the proceedings before the Trial Examiner to support the finding of the Board that the Company discriminatorily terminated the employment of employees Parks, Pelka, Schaunaman and Rosin in violation of Section 8(a)(3) and (1) of the Act.
 
 
 18
 Employee Schaunaman asked Milovich for a leave of absence on May 13, 1970 and Milovich agreed. At Milovich's request, Schaunaman delivered a letter to Milovich detailing their arrangement. Schaunaman then was informed by Milovich on June 5, 1970 that his request for a leave of absence was denied effective May 15, 1970 and that his employment was terminated as of that date.
 
 
 19
 All four men belonged to the Union. Employees Pelka, Parks and Rosin served as shop committee men during the negotiations of the unsigned contract. Also, Parks served as the union job steward in the plant, a position previously held by Pelka. Furthermore, President Milovich personally blamed Parks and Pelka for his later decision to close the plant. The three employees were informed by Milovich that he had to lay them off because of a shortage of work on May 19, May 26, and June 4 respectively, but the insurance company providing the pension and health plans was informed by Milovich that the three men had been terminated on the foregoing dates. Milovich's intentions were further accentuated by his refusal to accept the proffered insurance premiums from these employees during their "laid off" status.
 
 
 20
 Milovich closed Summit's operation on June 8, 1970 without notice to the Union or to the four employees previously severed from employment. Seven other employees who remained on this date were either transferred to Milovich's Ace Tool Engineering Company or themselves laid off. Unlike the four employees in question, Milovich notified the insurance company that the seven holdovers were entitled to both company and individual contributions to the pension fund.
 
 
 21
 The Company attempted before the Trial Examiner, the Board and on this appeal to justify the termination of these four men by alluding to the action after the lay off of removing their tools from the shop and attempting to find outside employment. Milovich asserted this action was indicative of their intention to quit his employ and his termination of employment was coincidental to their quitting. We do not agree.
 
 
 22
 From Milovich's statements in the record concerning the four discharged employees and the aforementioned indicia of anti-union animus on his behalf, we conclude that the Board properly found 8(a)(3) and (1) violations of the Act in the terminations of Parks, Pelka, Schaunaman, and Rosin.
 
 III.
 
 23
 A further Section 8(a)(5) violation was found by the Trial Examiner and sustained by the Board when Milovich closed the shop at Summit on June 8, 1970 without notice to the Union and without providing the Union with the opportunity to bargain with him concerning the effects of said closing on the affected employees. On the date, Milovich explained to Parks that no obligation remained on his behalf to the laid off men and he "would not meet with the Union on this matter because there were no people left". No economic setback was forwarded by Milovich as an excuse for the closing, and the hollow argument urged by the Company for the closure was that the continuation of business was impossible without employees to perform the work. Therefore, Milovich attempted to present an economic defense for closing predicated on his previous terminations which we have determined violative of the Act.
 
 
 24
 We hold the Company had the obligation to notify the Union directly about its decision to close the shop, Texaco Inc. v. NLRB, 407 F.2d 754 (7 Cir.1969); NLRB v. Northwestern Publishing Co., 343 F.2d 521 (7 Cir.1965), and to discuss and bargain about the effect of the Company's decision on the affected employees, NLRB v. Royal Plating & Polishing Co., 350 F.2d 191 (3 Cir.1965); Morrison Cafeterias Consolidated, Inc. v. NLRB, 431 F.2d 254 (8 Cir.1970); NLRB v. Drapery Mfg. Co., 425 F.2d 1026 (8 Cir.1970).
 
 
 25
 We are of the opinion that the Board's order is fair and enforceable modifying in part the order of the Trial Examiner. The order is directed solely toward making reparation to the affected employees and effectuating the policies of the Act. Therefore, a decree should issue wherein the order of the Board is enforced in its entirety.
 
 
 26
 Order enforced.
 
 
 
 [1]
 The Board's decision and order are reported at 195 NLRB No. 91
 
 
 [2]
 District 103, International Association of Machinists
 
 
 [3]
 The Union was justified in its demand for the record shows that the Company failed to mail any contributions to the insurance company until February 20, 1970 which was a full 5 months after the first contribution was due
 
 
 [4]
 The Company conceded before the Board that a valid contract was entered into when the Memorandum of Agreement was signed by both parties