No. 5        February 2, 2017        809

IN THE SUPREME COURT OF THE
STATE OF OREGON

AMERICAN FEDERATION OF
STATE COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL 75, LOCAL 2043,
*Petitioner on Review,*

*v.*

CITY OF LEBANON,
*Respondent on Review.*

(ERB UP1411; CA A152059; SC S062750)

En Banc

On review from the Court of Appeals.*

Argued and submitted June 16, 2015.

Giles Gibson, Legal Counsel, Oregon AFSCME, Council 75, Portland, argued the cause and filed the brief for petitioner on review.

John E. Kennedy, The Morely Thomas Law Firm, Lebanon, argued the cause and filed the brief for respondent on review.

Elizabeth A. Joffe, McKanna Bishop Joffe, LLP, Portland, filed the brief on behalf of *amici curiae* Oregon AFL-CIO, Oregon Education Association, Oregon Public Employees Union, Oregon State Firefighters Council, and Service Employees International Union Local 503.

BALDWIN, J.

The decision of the Court of Appeals is reversed. The case is remanded to the Employment Relations Board for further proceedings.

Landau, J., dissented and filed an opinion, in which Balmer, C.J., and Brewer, J., joined.

_____
* On judicial review from Order of Employment Relations Board, dated June 29, 2012. 265 Or App 288, 336 P3d 519 (2014).

**BALDWIN, J.**

This case requires us to consider whether the City of Lebanon (city) committed an unfair labor practice under Oregon's Public Employee Collective Bargaining Act (PECBA), ORS 243.650 - 243.782, when one of its council members, Campbell, wrote a letter to a local newspaper disparaging labor unions in general and calling for city employees to decertify their existing union. The Employment Relations Board (ERB or board) concluded that the city had engaged in an unfair labor practice based on Campbell's conduct. The Court of Appeals reversed, concluding that the city was not liable because Campbell had not acted as a "public employer or its designated representative" within the meaning of PECBA. *AFSCME Council 75 v. City of Lebanon*, 265 Or App 288, 336 P3d 519 (2014). For the reasons explained below, we reverse the decision of the Court of Appeals, and remand to ERB for further proceedings.

## I.   BACKGROUND

The undisputed facts, as summarized by the Court of Appeals, are:

> "According to the City of Lebanon Charter of 2004, the city is 'a municipal corporation' that includes 'all territory encompassed by its boundaries \*\*\*.' The city is also a public employer as defined by ORS 243.650(20). All powers of the city are vested in the city council, which is composed of a mayor and six councilors; the council delegates much of that power to the city administrator (manager), who is the 'administrative head of the government of the City.' Specifically, the city administrator (manager) is 'responsible for the daily operation of the City's departments and implementation of Council policy.'
>
> "The council is responsible for holding regular meetings, adopting 'rules for the government of its members and proceedings[,]' and appointing certain city officers. The council is also responsible for passing ordinances and voting on questions before it, including whether to approve 'a bond of a City officer or a bond for a license, contract or proposal[.]' Except as the city charter provides, 'the concurrence of a majority of the members of the Council present and voting at a Council meeting shall be necessary to decide any question before the Council.' Further, '[n]o action by the council

shall have legal effect unless the motion for the action and the vote by which it is disposed of take[] place at proceedings open to the public.'

"Campbell was appointed as a city councilor in 2010 and was a member of the budget committee. As a city councilor, she would 'be asked to vote and ratify any collective bargaining agreement with the Union that [was] negotiated by the City negotiation team.' However, Campbell was not a member of the city's labor negotiation team, and, [o]ver the last 10 years, no city councilor [had] been a member of the City's labor negotiation team.

"At the time of the events giving rise to this case, the city was experiencing a budget crisis, and the city and the union were parties to a collective bargaining agreement that was set to expire. The president of the union, along with the president of another union that represents city employees, co-authored a letter to the city. In that letter, the union presidents stated that the city should consider eliminating the positions of assistant city manager/human resources manager and human resources assistant before cutting essential services or laying off union workers.

"Shortly thereafter, Campbell sent a letter to the Lebanon Express, a local newspaper. The letter was addressed to 'All Citizens of Lebanon[.]' Campbell began the letter by stating:

"'I would like to inform all of you about some elements of my personal background before I get to the basis of my letter. Further I would like to clarify this letter is being written by me as an individual and not a reflection of a majority of the City Council, the City or my employer.'

"Campbell then described her and her family's involvement with unions, defended the city's human resources positions, and criticized unions in general. Campbell concluded the letter by stating:

"'To employees of the City and other organizations imprisoned by the dictatorship of a union as a private citizen I advise you to seek out the Department of Labor website where you can find instructions on how to de-certify your union captors. As an individual and former union member I believe you can put your union dues to better use in your own household budget and in supporting causes that truly express your own values.'

"'Sincerely,'
"'Margaret A. Campbell'
"'City Councilor'
"'Ward II'

"The newspaper published an article that summarized Campbell's letter. That article noted that the letter could be found on the newspaper's website and stated that Campbell planned to read the letter at a city council meeting. The parties later stipulated that Campbell did not read the letter at the meeting."

*City of Lebanon*, 265 Or App at 289-91 (alterations in orginal).

As a result of Campbell's conduct, AFSCME Council 75 (union) filed an unfair labor practice complaint against the city, alleging that Campbell's comments were made in her official capacity as a council member. The parties submitted the case on stipulated facts directly to ERB. The board concluded that the city violated PECBA when Campbell, in her letter, advised city employees "to seek out the Department of Labor website where you can find instructions on how to de-certify your union captors."[1] The board issued a cease-and-desist order and required the city to post an official notice of its wrongdoing. *See* ORS 243.676 (authorizing such remedy when unfair labor practice established). The board reasoned that a "public employer [under the PECBA] is liable for the actions of its officials" and that, because Campbell "spoke as the City's representative, liability for her remarks is ascribed to the City." The board observed that Campbell was "a member of a six-person Council in which the City Charter vests all powers. The Council *is* the public employer[,] and Campbell shares that status because she is a member of the Council." (Emphasis in original.) The board further noted that Campbell, "as a member of the council

---

[1] Specifically, the board concluded that the city had violated ORS 243.672(1)(a) and (b), which provide:

"It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"(a) Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662.

"(b) Dominate, interfere with or assist in the formation, existence or administration of any employee organization."

that is responsible for formulating all City policies and over-seeing all City operations, is a public employer."[2]

In the Court of Appeals, the city assigned error to ERB's conclusion that Campbell acted as a public employer or its designated representative under PECBA when she submitted her letter to the newspaper.[3] The Court of Appeals agreed with the city and reversed. The court concluded that Campbell was not the city's "designated representative" within the meaning of PECBA, because the record lacked any evidence that the city had "specifically designated" Campbell to act as its representative. *City of Lebanon*, 265 Or App at 295-96. Further, the court concluded that Campbell could not be a "public employer" under PECBA, because she was not acting as an agent when she submitted her letter to the local newspaper:

> "The union raises an interesting question by asserting that we should apply agency principles in this case: whether a public employer can be liable for an unfair labor practice committed by an agent other than its designated representative. However, we need not resolve that question because, even assuming without deciding that it is appropriate to apply agency principles in this context, we conclude that Campbell was not acting as the city's agent when she wrote and sent her letter."

*Id.* at 297 (footnote omitted).

---

[2] The board relied on its prior decision in *OPEU v. Jefferson County*, 18 PECBR 310 (1999), in which a county commissioner unlawfully refused to directly bargain with a union because bargaining unit members picketed his personal business. The commissioner told the president of the union that "he wanted to get rid of [the union]" and that he did not want to talk with the union's staff members. ERB concluded that the commissioner's statements interfered with the administration and existence of the union:

> "Ahern's comments, directed to OPEU's local president and almost certain to be relayed to other members of the bargaining unit, strike at the core of the relationship between the employees and OPEU. When one of the three main decision-makers for the County says he wants the employees to get rid of OPEU and not let OPEU staff members participate in bargaining, that directly impacts OPEU by undermining bargaining unit members' confidence in OPEU as exclusive representative."

*Id.* at 318 (footnote omitted).

[3] The city did not assign error to ERB's conclusions that Campbell's conduct otherwise amounted to an unfair labor practice or that holding the city liable for her comments did not violate the free speech guarantees of Article I, section 8, of the Oregon Constitution.

We accepted the union's petition for review to determine whether Campbell was either a "public employer" or a "designated representative" of the city under PECBA when she submitted her letter to the newspaper. On review, the city does not challenge ERB's conclusion that the portion of Campbell's letter urging city employees to decertify their union would constitute an unfair labor practice under ORS 243.672(1)(a) and (b) if committed by "a public employer or its designated representative." The only issue for us to resolve, therefore, is whether the city may be held liable for Campbell's actions because she was either a "public employer" or its "designated representative" within the meaning of PECBA.

## II.   ANALYSIS

### A.   *Purposes of PECBA and the NLRA*

We begin our analysis by briefly examining the legislature's purpose in enacting PECBA. This court has observed that, by enacting PECBA, first passed in 1973, "the legislature has provided a comprehensive statutory scheme authorizing and regulating collective bargaining between municipal and other public employers and employees, administered by ERB." *City of Roseburg v. Roseburg City Firefighters*, 292 Or 266, 268, 639 P2d 90 (1981). This court noted that PECBA was designed to improve relations between public employers and their employees:

> "*** PECBA is intended to protect [public employees'] economic welfare during their employment and to provide a means for them to affect certain negotiable working conditions. Another policy served by PECBA is to protect public safety by the substantive device of prohibiting strikes of public safety employees. The substantive goal of that ban is prevention of interruption in the provision of essential government services. The class of persons to be benefited by this policy extends beyond the population of any city. PECBA is expressly premised upon a legislative determination that the people of the state have an interest in public employment relations at both the state and local levels of government."

*Id.* at 276.

Basically, in enacting PECBA, the legislature extended to public employees in Oregon the same benefits and protections that federal law had long afforded to employees in the private sector under the National Labor Relations Act (NLRA).[4] Congress enacted the NLRA, a sweeping piece of labor legislation, in 1935. The overarching purpose of the NLRA, also known as the Wagner Act, was to protect employees against employer interference with their organizational rights. *See* John E. Higgins ed., 1 *The Developing Labor Law* 29 (6th ed 2012) ("The prime function of the Act was to protect employees against employer tactics designed either to obstruct organizational efforts or to withhold the fruits of those efforts."); *see also Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. NLRB*, 347 US 17, 40, 74 S Ct 323, 98 L Ed 455 (1954) ("The policy of the Act is to insulate employees' jobs from their organizational rights."). Senator Wagner, the sponsor of the bill, emphasized that purpose in his statements on the Senate floor. He argued that employees' ability to join the labor organizations of their choosing, free from employer interference, had become a necessity in the modern industrial era: "Caught in the labyrinth of modern industrialism and dwarfed by the size of corporate enterprise, [the employee] can attain freedom and dignity only by cooperation with [other employees]." 79 Cong Rec 7565 (May 15, 1935) (statement by Senator Wagner). He insisted that bill's purpose was to ensure employees' freedom of choice with regard to their organizational rights: "[The bill] does not force or even counsel any employee to join any union if he prefers to deal directly or indirectly with his employers. It seeks merely to make the worker a free man in the economic as well as the political field." *Id.*

To accomplish its broad purpose of protecting against interference with labor rights, the NLRA conferred on employees a "triad of rights": (1) the right to organize; (2) the right to bargain collectively; and (3) the right to engage in strikes, picketing, and other concerted activities. Higgins, *The Developing Labor Law*, at 28. The NLRA

---

[4] The NLRA applies only to private sector employment and expressly excludes public entities from the definition of "employer." *See* 29 USC § 152(2) (noting that an "employer" under the NLRA "shall not include the United States or * * * any State or political subdivision thereof").

further assured the enjoyment of those rights by declaring it an unfair labor practice for an employer to, among other things, interfere with, restrain, or coerce employees in the exercise of their rights under the Act. 29 USC § 158(1).

In many respects, PECBA was patterned after the NLRA. *See Elvin v. OPEU*, 313 Or 165, 175, 832 P2d 36 (1992) (noting that PECBA was "modeled" after federal act); Donald W. Brodie, *Public Sector Collective Bargaining in Oregon*, 54 Or L Rev 337, 337-38 (1975) (same).[5] Similar to the protections that the NLRA provides for private employees, PECBA provides public employees the right to form and join labor organizations, ORS 243.662; requires good faith in collective bargaining, ORS 243.672(e); and prohibits unfair labor practices, ORS 243.672(c). *See* Carlton J. Snow, *The Steelworkers Trilogy in Oregon's Public Sector*, 21 Willamette L Rev 445, 455 (1985) (identifying similar provisions in PECBA and NLRA). Indeed, PECBA and the NLRA define what constitutes an "unfair labor practice" in nearly identical ways. The NLRA provides, among other things, that it is an unfair labor practice for an employer:

"(1)  to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"(2)  to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it[.]"

29 USC § 158(a). Likewise, under PECBA, it is an unfair labor practice for "a public employer or its designated representative" to, among other things:

---

[5] The legislative history of PECBA makes little mention of the NLRA. That history indicates, however, that the legislature drew from other states' public sector bargaining acts, which—in turn—had been modeled after the federal act. *See, e.g.*, Tape Recording, Senate Committee on Labor, HB 2263, May 31, 1973, Tape 19, Side 2 (statement of Jim Redden, chairman of Governor's Task Force on Collective Bargaining in the Public Sector) (noting that PECBA was based on public bargaining statutes in other states—namely, New York, Hawaii, and California); Marcus R. Widenor, *Public Sector Bargaining in Oregon: The Enactment of the PECBA*, University of Oregon, LERC Monograph Series No. 8 (1989) (other states' bargaining laws in existence at time of PECBA's enactment "drew on the model for labor-management relations outlined for private sector workers in the National Labor Relations Act").

"(a)   Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662.

"(b)   Dominate, interfere with or assist in the formation, existence or administration of any employee organization."

ORS 243.672(1).

In addition to their nearly identical provisions relating to unfair labor practices, PECBA and the NLRA both express policies of promoting collective bargaining and protecting employees' organizational rights. The NLRA, for example, declares that it is the policy of the United States to reduce the causes of industrial strife by encouraging collective bargaining and protecting employees' exercise of "full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 USC § 151. Similarly, the 1973 Legislative Assembly declared it to be the policy of Oregon that "[t]he people of this state have a fundamental interest in the development of harmonious and cooperative relationships between government and its employees." ORS 243.656(1). The Oregon legislature also declared that the purposes of PECBA are to "obligate public employers, public employees and their representatives to enter into collective negotiations with willingness to resolve grievances and disputes relating to employment relations" and to promote improved employer-employee relations "by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice, and to be represented by such organizations in their employment relations with public employers." ORS 243.656(5).

B.   *Whether Campbell's Statements May Be Imputed to the City*

Having briefly described the purposes of PECBA and its similarities to the NLRA, we now turn to the question on review: Was Campbell's conduct that of a "public employer or its designated representative" within the meaning of PECBA when she submitted her letter to the newspaper encouraging city employees to decertify their union?

The union argues that Campbell is a "public employer" by virtue of her membership on the city's governing body. The union also reprises the argument it made in the Court of Appeals that federal cases interpreting and applying the NLRA support its position that Campbell should be viewed as a "public employer" under PECBA. For its part, the city argues that, under its charter, members of the council are not authorized to act individually and that a majority vote of the council is required for the council to take official action. As a result, the city contends that an individual city councilor cannot be a "public employer" for purposes of PECBA. Further, the city argues that a city councilor is not a "designated representative" of the city, because city councilors are not specifically designated by the city to act in its interests in labor matters. Rather, under the city's charter, only the city manager has the authority to hire, fire, or discipline any city employee.

We review ERB's order holding the city liable for an unfair labor practice for legal error. ORS 183.482(8). To resolve this interpretive dispute as to whether Campbell acted as a "public employer or its designated representative" under ORS 243.672(1), we examine the text of the statute in context together with any relevant legislative history to determine legislative intent. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).[6]

As noted, ORS 243.672(1) provides, in part:

"(1)   It is an unfair labor practice for a *public employer or its designated representative* to do any of the following:

"(a)   Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662.

"(b)   Dominate, interfere with or assist in the formation, existence or administration of any employee organization."

(Emphasis added.)

---

[6] We do not give deference to ERB's interpretation of "public employer" under the statute, because such deference is not given when a term is inexact. *Blachana, LLC v. Bureau of Labor and Industries*, 354 Or 676, 687, 318 P3d 735 (2014) (description of "exact," "inexact," and "delegative" terms for purposes of determining deference to agency when disputed statutory term is part of regulatory scheme). The term "public employer" is an inexact term, because it is imprecise, requiring further interpretation. *Id.*

1.  *"Public employer"*

We begin by analyzing whether Campbell acted as a "public employer" within the meaning of ORS 243.672(1) when she wrote her letter. PECBA defines a "public employer" as

> "the State of Oregon, and the following political subdivisions: *Cities*, counties, community colleges, school districts, special districts, mass transit districts, metropolitan service districts, public service corporations or municipal corporations and public and quasi-public corporations."

ORS 243.650(20) (emphasis added). Thus, under the plain terms of the statute, the city in this case is a "public employer."

As a corporate entity, a city can act in either of two ways. It can take official action in accordance with its governing documents, or it can act through its agents. In this case, we need not decide whether the term "public employer" extends to the city's agents, because another provision of ORS 243.650 specifically prohibits at least some city agents from engaging in unfair labor practices. As noted, ORS 243.672(1) makes it an unfair labor practice for a public employer *or its designated representative* to engage in specified conduct. Subsection (21) of ORS 243.650 defines the term "public employer representative" as "includ[ing] any individual or individuals specifically designated by the public employer to act in its interests in all matters dealing with employee representation, collective bargaining and related issues." Thus, if Campbell was acting as the city's "designated representative" when she wrote her letter, the city may be held liable for her conduct.

2.  *"Designated representative"*

Before determining whether Campbell was a "designated representative" of the city, we first address a somewhat curious discrepancy in the terminology that the legislature used to describe the individuals whom a public employer designates to act in its interests. As noted, ORS 243.672(1) prohibits a "public employer or *its designated representative*" from engaging in an unfair labor practice. The statute does not define what constitutes a "designated representative" of

a public employer, however. Instead, as discussed, the statute defines the similar term "public employer representative." Ordinarily, we presume that different terms in a statute connote different meanings. *See, e.g.*, *State v. Connally*, 339 Or 583, 591, 125 P3d 1254 (2005) (so stating). What makes the use of different terms in this case perplexing, however, is that the defined term "public employer representative" does not appear anywhere else in the statute. As a result, if we were to interpret a "public employer representative" under ORS 243.650(21) to mean something different than a "designated representative" of a public employer under ORS 243.672(1), then we would relegate the former term to mere surplusage—a result that this court seeks to avoid. *See Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 311, 297 P3d 1256 (2013) ("As a general rule, we construe a statute in a manner that gives effect, if possible, to all its provisions.").

Given the textual similarity between a "public employer representative," which is defined as an individual whom a public employer designates to act in its interests, and a "designated representative [of a public employer]," we find it likely that the legislature intended those terms to be used interchangeably. Indeed, that is a more harmonious reading of the statute than one that would read ORS 243.650(21) out of PECBA. *See* ORS 174.010 (when construing statutes, court may not omit text that legislature inserted). We therefore construe a "public employer representative" and a "designated representative [of a public employer]" under PECBA to be synonymous. Accordingly, we use those terms interchangeably in this opinion.

We now consider whether Campbell acted as a "designated representative" of the city in writing her letter, such that the city may be held liable for her conduct under ORS 243.672(1). As noted, ORS 243.650(21) provides that a public employer representative "*includes* any individual or individuals specifically designated by the public employer to act in its interests in all matters dealing with employee representation, collective bargaining and related issues." (Emphasis added.) The legislature's use of the term "includes" indicates that a "public employer representative" is not limited to those individuals whom a public employer specifically

designates to act in its interests in all labor-related matters. *See Haynes v. Tri-County Metro.,* 337 Or 659, 664-65, 103 P3d 101 (2004) (when legislature uses term "include," definition is nonexclusive); *Beaver v. Pelett*, 299 Or 664, 668, 705 P2d 1149 (1985) (legislature's use of verb "includes," rather than "means," indicates that definition is not exhaustive). Rather, the term "includes" suggests that a "public employer representative" also encompasses some broader category of individuals who act on behalf of a public employer.

Our task in determining whether Campbell is a "public employer representative," therefore, is twofold. First, we must determine whether the city "specifically designated" her to act in its interests in "all" matters dealing with employee representation. Second, if not, we must determine which other individuals may constitute "public employer representatives" and whether Campbell was such an individual.

With regard to the first inquiry, the record does not show that the city "specifically designated" Campbell "to act in its interests in all matters dealing with employee representation, collective bargaining and related issues." ORS 243.650(21). Nor does the union offer any evidence or argument to support such a proposition. We therefore conclude that Campbell was not the type of representative whom a public employer "specifically designates" to act in its interests in all labor matters.

Turning to the second inquiry, we must determine which other individual representatives of a public employer the legislature intended the term "public employer representative" to include. The dictionary defines a "representative" as "one that represents another as agent, deputy, substitute, or delegate usu. being invested with the authority of the principal." *Webster's Third New Int'l Dictionary* 1926-27 (unabridged ed 2002). Similarly, it defines the verb "represent" as

"to supply the place, perform the duties, exercise the rights, or receive the share of **:** take the place of in some respect **:** fill the place of for some purpose **:** substitute in some capacity for **:** act the part of, in the place of, or for (as another person) usu. by legal right."

*Id.* at 1926. Under its plain meaning, then, the term "representative" suggests some type of agency relationship between a public employer and its representative—that is, that a public employer representative is in some way authorized to act "in the place of, or for" the public employer. As discussed, however, the text of ORS 243.650(21) does not exhaustively define which individual agents might be considered a "representative" of a public employer.

Because ORS 243.650(21) does not exhaustively define a "public employer representative," we look to the statutory context for guidance. One contextual clue is the legislature's statement of policy. *See US National Bank v. Boge*, 311 Or 550, 560-61, 814 P2d 1082 (1991) (express purpose statement may be considered as context). As noted at the beginning of this analysis, the legislature included a policy statement in PECBA, generally modeled after the policies articulated in the NLRA, expressly finding and declaring that the people of Oregon "have a fundamental interest in the development of harmonious and cooperative relationships between government and its employees." ORS 243.656(1). To that end, the legislature stated that "[r]ecognition by public employers of the right of public employees to organize and full acceptance of the principle and procedure of collective negotiation between public employers and public employee organizations can alleviate various forms of strife and unrest." ORS 243.656(2). The legislature further recognized that "protection by law of the right of employees to organize and negotiate collectively safeguards employees and the public from injury, impairment and interruptions of necessary services." ORS 243.656(3). Ultimately, the legislature stated that the purpose of PECBA was to "promote the improvement of employer-employee relations within the various public employers by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice, and to be represented by such organizations in their employment relations with public employers." ORS 243.656(5). The legislature's statement of policy thus demonstrates an intent for PECBA to apply broadly in favor of public employees' rights to organize and bargain collectively.

That intent is borne out by other provisions of PECBA as well. *See Force v. Dept. of Rev.*, 350 Or 179, 188, 252 P3d 306 (2011) ("'[C]ontext' includes, among other things, other parts of the statute at issue."). For example, PECBA expressly provides that "[p]ublic employees have the right to form, join and participate in the activities of labor organizations of their own choosing." ORS 243.662. That right is protected by ORS 243.672—the provision at issue in this case—which imposes liability for various unfair labor practices. As relevant to this case, a public employer or its designated representative commits an unfair labor practice if the employer or representative "interfere[s] with, restrain[s] or coerce[s] employees in or because of the exercise of rights guaranteed in ORS 243.662." ORS 243.672(1)(a). Read together, those provisions further demonstrate the legislature's intent for PECBA to broadly protect public employees against employer interference with their organizational and bargaining rights.

The statutory context thus indicates that the term "public employer representative" should be construed broadly. Neither the text of ORS 243.650(21) nor other, related provisions of PECBA, however, conclusively identify which individual agents of a public employer are "include[d]" within the definition of a "public employer representative." We therefore seek guidance on that point from relevant federal case law that has developed under the NLRA. Specifically, we consider federal cases interpreting the NLRA that were in existence at the time that the legislature enacted PECBA. Those cases, although not binding on this court, provide persuasive authority for this court's interpretation of PECBA, because, as noted, the legislature largely modeled Oregon's statute after the federal one. *Elvin*, 313 Or at 177 ("Because *** PECBA was adopted to model the NLRA, we look to cases decided under the NLRA, and particularly to cases decided prior to 1973—the year in which PECBA was adopted—to obtain guidance in interpreting PECBA.").[7]

---

[7] The dissent argues that there is "no textual connection" between the PECBA and the NLRA that would provide a basis for concluding that the Oregon legislature intended the PECBA to incorporate the federal case law that existed under the NLRA. 360 Or at __ (Landau, J., dissenting). We disagree. Both the state and federal statutes prohibit an "employer" from committing an unfair labor practice. And both statutes provide that it is an unfair labor practice for an

As early as 1974—shortly after PECBA was enacted—the Oregon Court of Appeals acknowledged the similarities between the state and federal statutes, and concluded that federal case law interpreting the NLRA could provide guidance in interpreting related provisions of PECBA. *See Klamath County v. Laborers Int'l Union, Local 915*, 21 Or App 281, 288, 534 P2d 1169 (1975) ("[T]he similarity between parts of the two statutes indicates that federal decisions interpreting the NLRA be given some weight in interpreting similar sections of the Oregon statute."). Since that time, Oregon appellate courts have continued to consider federal case law for its persuasive value in interpreting PECBA. *See*, *e.g.*, *Elvin*, 313 Or at 179 ("[W]e interpret PECBA by looking to how the NLRA was interpreted before 1973[.]"); *Assn. of Oregon Corrections Emp. v. State of Oregon*, 267 Or App 413, 418, 343 P3d 637 (2014) (because PECBA was modeled after NLRA, "federal case law provides guidance in interpretation of PECBA"); *Portland Assn. Teachers v. Mult. Sch. Dist. No. 1*, 171 Or App 616, 631 n 6, 16 P3d 1189 (2000) (because PECBA adopted to model NLRA, court looked to "cases decided under the federal act—and particularly to cases decided before 1973, the year in which PECBA was adopted—for guidance in interpreting PECBA"). We once again seek guidance from federal

employer to "interfere with, restrain or coerce employees" in the exercise of their organizational rights. ORS 243.672(1); 29 USC § 158(a)(1). Based on that textual connection—as well as the shared purpose of the two statutes—we conclude that the relevant federal case law in existence at the time of PECBA's enactment provides persuasive authority when interpreting the unfair-labor-practice provisions of PECBA. *See State v. Kennedy*, 295 Or 267, 267, 666 P2d 1316 (1983) (recognizing that this court may rely on federal case law in interpreting provision of Oregon law, not because we are bound to do so, but because we find that case law persuasive). This court has often looked to relevant federal case law for its persuasive value in interpreting an Oregon statute when that statute was modeled after a federal statute. *See*, *e.g.*, *Redmond Ready-Mix, Inc. v. Coats*, 283 Or 101, 110, 582 P2d 1340 (1978) (when Oregon's Anti-Price Discrimination Law modeled after federal acts, "federal cases interpreting the federal statutes are persuasive to us in interpreting the Oregon statue"); *Karsun v. Kelley*, 258 Or 155, 161, 482 P2d 533 (1971) (when Oregon's Blue Sky Law amended "to adopt substantially the same terms as set forth in the Federal Security Act[,] *** the legislative history of that act, as well as decisions construing its provisions, are of significant interest"). Indeed, this court has found federal law persuasive even when two comparable statutes are not identical. *See State v. Walker*, 356 Or 4, 23 n 9, 333 P3d 316 (2014) (looking to federal RICO statute, upon which Oregon's RICO statute was modeled, even though Oregon provision had been "modified somewhat"; noting that Oregon's provision was "not *** inconsistent" with federal one).

law in this case in an effort to discern the meaning that the legislature intended to ascribe to the term "public employer representative."[8]

Federal courts interpreting the NLRA have often been confronted with the question of which individual agents' conduct may be imputed to an employer for purposes of unfair-labor-practice liability. As with a public employer, an employer in the private sector is capable of acting only through its individual officers and agents. *See, e.g.*, *Corporations*, 18B Am Jur 2d § 1139 at 182 (2015) ("A corporation can act only through the authorized acts of its corporate directors, officers, and other employees and agents."); 1 *Corporations*, 8 CJS § 7 at 314 (2007) ("A corporation can only act through natural persons who are in charge of its affairs."). The NLRA takes that reality into account by defining an "employer" to include the individuals through whom a company acts. As originally enacted, the NLRA defined an "employer" to include "any person acting in the interest of an employer, directly or indirectly." National Labor Relations Act, ch 372, § 2, 49 Stat 450 (1935). As we will discuss, Congress later amended that definition to include "any person acting *as an agent* of an employer, directly or indirectly." 29 USC § 152(2) (emphasis added). Under either version, however, federal courts have determined an employer's liability for an individual agent's unfair labor practice by considering the nature of the individual's position within the company and whether other employees would reasonably

---

[8] The dissent acknowledges that the definition of "public employer representative" leaves open "the possibility that others not specifically designated [in the definition] may also be included" but argues that that definition "reflects an obvious parallel to common-law principles of agency with which we presume the legislature was familiar," citing *State v. Ramos*, 358 Or 581, 368 P3d 446 (2016). 360 Or at ___ (Landau, J. dissenting). In *Ramos*, this court concluded that "reasonable foreseeability" is a limiting concept that applies to an award of economic damages under ORS 137.106, a statute requiring that a defendant pay restitution equal to the full amount of a victim's economic damages resulting from the defendant's crime. *Id.* at 596. Because the legislature "adopted the definition of "economic damages" that applies in civil actions," the court concluded, "it [is] likely that the legislature intended to apply the traditional civil law concept of reasonable foreseeability to determine whether claimed damages are 'too remote,' rather than intending that some other test of 'remoteness' apply." *Id.* at 596-97. We do not agree that the legislature—by using the term "representative"—has clearly adopted common-law principles of agency when "representative" is not a common-law concept. *See also* *State v. Stark*, 354 Or 1, 10, 307 P3d 418 (2013) (court presumes legislature is aware of existing law).

perceive that individual to have been authorized to speak for the employer.

With regard to the conduct of individuals at the highest levels of authority, federal courts generally have assumed, without explicit analysis, that an employer may be held responsible. In particular, federal courts have held that an employer is responsible for the conduct of its executive officers—*i.e.*, officers who have the authority to determine the company's general business and labor policies. E. H. Schopflocher, Annotation, *Unfair Labor Practice, within National Labor Relations Act or Similar State Statute, Predicated upon Statements or Acts by Employees Not Expressly Authorized by Employer*, 146 ALR 1062 (1943). Indeed, courts have treated the proposition that an executive officer may bind the company as so obvious as to not warrant discussion. *See*, *e.g.*, *Morgan Precision Parts v. NLRB*, 444 F2d 1210, 1215 (5th Cir 1971) (company responsible for company owner's anti-union activity); *Madison Brass Works, Inc. v. NLRB*, 381 F2d 854, 857 (7th Cir 1967) (company president's remarks threatening economic reprisal if employees unionized constituted unfair labor practice); *NLRB v. John & Ollier Engraving Co.*, 123 F2d 589, 593 (7th Cir 1941) (employer responsible for unfair labor practices of "executive officers"); *NLRB v. Lightner Pub. Corp. of Illinois*, 113 F2d 621, 625 (7th Cir 1940) (holding corporate employer liable for unfair labor practice committed by corporation's president where president wrote letters to men on strike indicating that he would not negotiate with representatives of employees); *NLRB v. Ed. Friedrich, Inc.*, 116 F2d 888, 890 (5th Cir 1940) (holding that, to establish company domination or support of unaffiliated union, it was not necessary to prove express acts by stockholders or executive officers of company—thereby implying that, as matter of course, company was responsible for acts of those persons).

The more challenging question for federal courts has been whether an employer may be held responsible for the actions of individuals who hold a position of authority that is less than an executive officer but greater than a rank-and-file employee. Such an employee generally occupies

some type of supervisory position, but is not entrusted with the duty to determine the employer's general business and labor policies. Shortly after the NLRA was enacted, the United States Supreme Court addressed the question of an employer's responsibility for the unfair labor practices of such individuals in two cases: *International Association of Machinists, Tool and Die Makers Lodge No. 35 v. Labor Board*, 311 US 72, 61 S Ct 83, 85 L Ed 50 (1940), and *H. J. Heinz Co. v. NLRB*, 311 US 514, 61 S Ct 320, 85 L Ed 309 (1941).

In *International Association of Machinists*, the Court upheld a determination by the National Labor Relations Board (NLRB) that an employer was responsible for the organizational efforts of several low-level employees, despite the fact that the employer had not expressly authorized or ratified the employees' actions. Rejecting the notion that strict principles of agency law applied when determining employer responsibility under the NLRA, the Court concluded that an employer could be held responsible for the actions of its "so-called agents" even though those acts "were not expressly authorized or might not be attributable to [the employer] on strict application of the rules of respondeat superior." *Id.* at 80. The Court explained:

> "We are dealing here not with private rights \*\*\* nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible."

*Id.* Ultimately, the Court announced the following rule for determining when an employer "may fairly be said to be responsible" for an agent's unfair labor practice: "[W]here the employees would have just cause to believe that [the agents] were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." *Id.*

In *Heinz*, the Court addressed a similar claim by an employer that it could not be held responsible for the unfair labor practices of several supervisors, because the employer had not authorized or ratified those employees' conduct. Again, the Court held that the supervisors' conduct was chargeable to the employer, reiterating that the question of employer liability under the NLRA did not hinge on strict principles of agency or *respondeat superior*:

> "The question is not one of legal liability of the employer in damages or for penalties on principles of agency or respondeat superior, but only whether the Act condemns such activities as unfair labor practices so far as the employer may gain from them any advantage in the bargaining process of a kind which the Act proscribes."

311 US at 521.

After the Supreme Court decided *International Association of Machinists* and *Heinz*, Congress enacted the Labor Management Relations Act of 1947, also known as the Taft-Hartley Act. Labor Management Relation Act of 1647, ch 120, 61 stat 136 (1947). That Act amended various provisions of the NLRA, including the definition of an "employer." The Taft-Hartley amendments changed the definition to its current text: "any person acting as an agent of an employer, directly or indirectly." 29 USC § 152(2). Despite the narrowing of the definition of an employer from any "person" acting in the interest of an employer to any person acting as an "agent" of an employer, however, federal courts have repeatedly affirmed the liberal principles of employer responsibility originally announced in *International Association of Machinists* and *Heinz*. See, e.g., *Ingress-Plastene, Inc. v. NLRB*, 430 F2d 542, 545 n 3 (7th Cir 1970) (whether person who committed unfair labor practice was supervisor "is irrelevant so long as she gave the appearance of acting on behalf of management;" citing *International Association of Machinists*); *Amalgamated Clothing Workers of America, AFL-CIO v. NLRB*, 371 F2d 740, 744 (DC Cir 1966) (employer responsibility under NLRA "is not controlled by refinements of the law of agency"); *NLRB v. Houston Chronicle Pub. Co.*, 300 F2d 273, 280 (5th Cir 1962) (because supervisor was in position to give his subordinates cause to believe that he

was acting for management, his unfair labor practice was attributable to employer; citing *International Association of Machinists* and *Heinz*); *NLRB v. Hart Cotton Mills*, 190 F2d 964, 974 (4th Cir 1951) (employer responsibility for acts of supervisory employees "is not determined by applying principles of agency or respondeat superior but by ascertaining whether the conduct or activity is condemned by the Act;" citing *Heinz*).[9]

Thus, even after the Taft-Hartley amendments, federal courts have continued to determine employer responsibility for unauthorized actions of an individual by analyzing whether employees would reasonably believe that the individual was acting for and on behalf of the employer. *See, e.g.*, *American Door Co., Inc.*, 181 NLRB 37, 43 (1970) (crucial question in determining whether employer is responsible for acts of "so called agents" is whether, considering all circumstances, "the employees could reasonably believe that [the purported agent] was reflecting company policy, and speaking and acting for management") (citing *NLRB v. Des Moines Food, Inc.*, 296 F2d 285, 287 (8th Cir 1961)); *Irving Air Chute Co. v. NLRB*, 350 F2d 176, 179 (2d Cir 1965) (broad rule under NLRA places responsibility on employer for acts of supervisor when employees "would have just cause to believe" that supervisor was acting for and on behalf of company); *NLRB v. Geigy Co.*, 211 F2d 553, 557 (9th Cir 1954) (whether statements of foreman were attributable to employer depended on whether employees "might reasonably have believed" that, in making them, foreman was acting for and on behalf of management).

In applying that "reasonable belief" standard, federal courts have considered "all factors, often subtle, which

---

[9] That is so despite legislative history indicating an intent for the new definition of employer to incorporate traditional agency principles. *See, e.g.*, *NLRB v. International Longshoremen's and Warehousemen's Union Local 10*, 283 F2d 558, 563 (9th Cir 1960) (noting that "Senator Taft, the life-force behind the bill as enacted, repeatedly remarked on the floor of the Senate that common law rules of agency were to govern the question of who acted for whom for purposes of determining culpability under the Act"). Indeed, some federal decisions have applied strict principles of agency law when determining employer liability under the NLRA. For the reasons that we explain, however, we find those federal cases that have applied the broader "reasonable belief" standard to be more consistent with the statutory purpose of protecting employees' labor rights and, therefore, more persuasive.

restrain the employees' choice and for which the employer may fairly be said to be responsible." *International Association of Machinists*, 311 US at 80. "It is unnecessary that all factors be present in each case, for one or more may be sufficient to authorize the inference [that the individual acted on behalf of the employer.]" *NLRB v. Pacific Gas & Electric Co.*, 118 F2d 780, 787-88 (9th Cir 1941). Among other factors, courts have considered whether the individual acting on behalf of the employer occupied a high-ranking position within the company hierarchy, whether the individual's responsibilities put him or her in a position to be identified with management in the eyes of employees, whether the individual set management policy, whether the individual was in a strategic position to translate the policies and desires of management to other employees, whether the individual had the power to hire and fire employees, and whether the employer disavowed the actions of the individual. *See, e.g.*, *International Association of Machinists*, 311 US at 80-81 (considering individuals' position in factory hierarchy, their power to hire or fire, and whether they exercised "general authority over the employees and were in a strategic position to translate to their subordinates the policies and desires of the management"); *Amalgamated Clothing Workers of America,* 371 F2d at 744 (considering employer's "lack of disavowal" of individual's actions); *McKinnon Services, Inc.*, 174 NLRB 1141, 1144 (1969) (whether or not individual was technically considered "supervisor" under NLRA, "her responsibilities put her in a position to be identified with management in the eyes of the employees and to translate to them the policies and desires of management").

Having summarized the relevant federal case law, we now consider what guidance, if any, that case law provides in determining the limits of a public employer's liability under PECBA for the unfair labor practices of its "designated representative." We note, initially, that the two statutes define an employer somewhat differently. That is understandable, given that one statute defines an employer in the public sector and the other defines an employer in the private sector. Despite that difference, however, the acts are otherwise remarkably similar. PECBA and the NLRA are driven by the same policy of preventing employer

interference with employees' organizational and bargaining rights. Both statutes protect those rights by proscribing unfair labor practices, and both statutes define an "unfair labor practice" in virtually identical terms. *Compare, e.g.*, ORS 243.672(1)(a) (unfair labor practice for public employer or its designated representative to "[i]nterfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662"), *with* 29 USC § 158(a) (unfair labor practice for employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title"). Further, in identifying an employer's responsibility for an unfair labor practice, both statutes provide that an employer may be held liable for the conduct of the formal entity constituting the "employer," as well as for the conduct of at least some individual agents who act on that entity's behalf. Given the statutes' similarities in both text and purpose, we conclude that the legislature intended the provisions of PECBA at issue in this case to be interpreted in line with the preexisting case law under the NLRA. In addition, we conclude that the "reasonable belief" standard that federal courts have adopted in interpreting the NLRA is a well-reasoned one, and one that best effectuates the legislature's policy goal of protecting employees' organizational rights from employer interference.

For those reasons, we adopt the "reasonable belief" standard under PECBA for determining which individuals constitute a "public employer representative," such that a public employer may be held responsible for the unfair labor practices committed by such individuals. Specifically, when employees of a public employer would reasonably believe that a given individual acted on behalf of the public employer in committing an unfair labor practice, that individual is a "public employer representative" under ORS 243.650(21), and the public employer may be held liable for the conduct of that individual under ORS 243.672(1).

In applying the "reasonable belief" standard, adjudicators should consider "all factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible." *International Association of Machinists*, 311 US at 80. One key factor will be whether the individual acting on behalf of the public entity occupied

a high-ranking position within the public entity. As the federal courts have recognized, the potential for interference with employees' labor rights is greatest at the highest levels of authority. Moreover, the greater an individual's general policy-making authority, the more likely that employees would reasonably believe that that individual acted on behalf of the entity. Other relevant factors include whether the individual acted in his or her official capacity when he or she committed the unfair labor practice, whether the individual had the power to hire and fire employees of the public entity, and whether the public entity disavowed the actions of the individual. One or more of those factors may be sufficient to authorize the inference that the individual acted on behalf of the public entity and that the entity is therefore liable for the individual's actions. *Pacific Gas & Electric Co.*, 118 F2d at 787-88.

In adopting the "reasonable belief" standard, we reject the argument of the city and dissent that the statements of an individual city councilor cannot be imputed to the city. They argue, however, that an action by a city council member without the concurrence of a majority of the council has no legal effect and that, therefore, the city cannot be liable for the unfair labor practices of an individual council member. The dissent argues that the acts of individuals generally do not bind public entities. 360 Or at ___ (Landau, J., dissenting). However, this case does not involve the scope of municipal liability under general principles of tort and contract law. Rather, this case involves the scope of liability for a public employer for unfair labor practices under the specific statutory framework of PECBA.

Moreover, under the view of the city and dissent, voting members of a public employer would be allowed to violate PECBA with impunity. Indeed, multiple members of a voting body could interfere with protected union activity as long as less than a majority of the body acted. That circumstance would contravene the legislature's express declaration that "[t]he people of this state have a fundamental interest in the development of harmonious and cooperative relationships between government and its employees." ORS 243.656(1). It would also be at odds with the legislative recognition that public employees "have the right to form, join

and participate in the activities of labor organizations of their own choosing," as stated in ORS 243.662. Indeed, the city's narrow interpretation—which would require a majority of the council to commit a violation—does not capture the many ways in which voting members of the council, acting on behalf of the city, might "[i]nterfere with, restrain or coerce employees in or because of the exercise of rights guaranteed" in PECBA. ORS 243.672(1). Such an interpretation would therefore undermine the legislature's intention that PECBA broadly protect public employees' rights against employer interference.[10]

We now apply the rule that we announce today to the facts of this case. The ERB did not address whether Campbell was a "designated representative" of the city within the meaning of ORS 243.672(1), such that the city nevertheless may be held liable for her conduct. We therefore remand to ERB to make that determination in the first instance. ORS 183.482(8). On remand, ERB must determine whether city employees would reasonably believe that Campbell was acting on behalf of the city when she wrote her letter urging city employees to decertify the union. In making that determination, ERB should consider all relevant factors, including, but not limited to, whether Campbell occupied a high-ranking position within the city, whether Campbell

---

[10] Relatedly, the dissent argues that NLRA decisions imposing liability on private employers for the acts of executive or management personnel have no application to the Lebanon City Council because employees in the private sector have individual authority to act and city council members do not. 360 Or ___ (Landau, J., dissenting). We agree that the comparison of a public body to executive officers in a private company is not a perfect fit. However, as we have discussed, the provisions of PECBA evidence an intention by the legislature that public employees in Oregon receive the same benefits and protections that the NLRA provide to employees in the private sector. We emphasize that the rule we adopt today is not based solely on the authority of an individual member of a public body to act. The rationale for the rule is based instead on whether the conduct of an individual is such that an employer may gain an advantage from an individual's interference with union organizing or the collective bargaining process. *See NLRB v. Hart Cotton Mills*, 190 F2d at 974 (employer responsibility for acts of individuals "is not determined by applying principles of agency or respondeat superior but by ascertaining whether the conduct is condemned by the act," citing *Heinz*). Thus, as we have explained, although the authority of Campbell to act on behalf of the city may—in various ways—be considered as a relevant factor in applying the "subjective belief" test, her individual authority does not, as a matter of law, determine whether the city may be held liable for her conduct.

had general policy-making authority for the city, whether Campbell had the authority to hire and fire city employees, whether Campbell acted within her official capacity as a city councilor when she made her statements, and whether the city disavowed Campbell's statements.

Because we conclude that Campbell may have been a "designated representative" of the city, depending on whether city employees would have reasonably believed that she acted on behalf of the city in urging those employee to decertify the union, we reverse the Court of Appeals decision that Campbell could not be a "designated representative" under PECBA.

The decision of the Court of Appeals is reversed. The case is remanded to the Employment Relations Board for further proceedings.

### LANDAU, J.

The majority holds that the City of Lebanon may have committed an unfair labor practice because a single one of its City Council members, Margaret Campbell, wrote a letter to the editor of a local newspaper expressing her personal opinion about labor unions. The majority reaches that conclusion despite the fact that Campbell wrote the letter "as an individual and not a reflection of a majority of the City Council, the City or [her] employer." The majority ignores the fact that she was not authorized to speak for the city; that she was not designated as the city's representative in collective bargaining negotiations; and that, in fact, under the terms of the city charter, she had no independent authority whatsoever.

The majority's decision is wrong. It cannot be reconciled with the terms of the statute that the city is supposed to have violated. Nor can it be squared with settled rules of statutory construction. It is justified, not by reference to what the governing statute actually says, but by the majority's views about the overriding policies of that statute, informed by an extended analysis of case law construing a federal statute that does not even apply here. Because I cannot join in that decision, I must respectfully dissent.

The Public Employees Collective Bargaining Act (PECBA) provides that it is an unfair labor practice for "a public employer or its designated representative" to engage in any of a prohibited list of actions. ORS 243.672(1). The law thus provides that an unfair labor practice may be committed on the one hand by a government entity—"a public employer"—and on the other hand by an individual—"its designated representative." The question in this case is whether Campbell is a government entity or a person designated to represent a government entity.

She is neither. Certainly, Campbell is not a government entity. She is a single member of the seven-member governing body of the City of Lebanon. But in no reasonable sense of the term can it be said that she *is* the City of Lebanon, any more than it can be said that a single one of the 90 members of the Oregon Legislative Assembly *is* the State of Oregon. Moreover, no party claims that she is the city's "designated representative." That should be the end of the matter.

The majority nevertheless concludes that the City of Lebanon may have committed an unfair labor practice based on the unauthorized act of its individual council member. The majority concludes that, in writing her letter, Campbell acted as the city's "designated representative."

The majority arrives at that conclusion by reasoning that, although PECBA does not define the term "designated representative," it does define a different term that at least comes close—"public employer representative." And the statute defines *that* term as merely *including* one who has been "specifically designated by the public employer to act in its interests in all matters dealing with employee representation" and related matters. ORS 243.650(21). That, says the majority, means that the term could include other things as well. To determine what other things the term could embrace, the majority turns to case law construing the federal National Labor Relations Act (NLRA), which it reads as holding that unfair labor practices may be committed by any person whom an employee "reasonably believes" speaks on behalf of the employer, regardless of whether the employer designated the individual to speak on its behalf or

took any other action to clothe the individual with apparent authority.

The majority's reasoning does not withstand scrutiny.

To begin with, it is at odds with the text of the statute. ORS 243.672(1) plainly provides that the only individual who may commit an unfair labor practice is a public employer's "designated representative." Although the majority refers to the ordinary meaning of the term "representative," it curiously omits any reference to the term "designated." In fact, it reads the word out of the statute entirely. In the majority's view, an individual may commit an unfair labor practice if an employee reasonably believes the individual speaks for the employer, regardless of whether the employer designated the individual to act on its behalf. Longstanding principles of statutory construction instruct that, whenever possible, we are to give effect to all of a statute's terms. *See, e.g.*, *State v. Cloutier*, 351 Or 68, 98, 261 P3d 1234 (2011) ("[I]f possible, we give a statute with multiple parts a construction that will give effect to all of those parts.") (internal quotation marks omitted); *Owens v. Maass*, 323 Or 430, 437, 918 P2d 808 (1996) ("[W]henever possible, this court must construe different provisions of a legislative enactment so as to give effect to each provision.") The majority fails to explain why it is not possible to give effect to the word "designated" as it is used in ORS 243.672(1).

The fact is that it is entirely possible to give effect to all statutory terms in ORS 243.672(1). The term "designated representative" is not defined in the statute. We generally assume that the legislature intended undefined statutory phrases to be given their ordinary meaning. *See, e.g.*, *OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 589, 341 P3d 701 (2014) ("In the absence of evidence to the contrary, we assume that the legislature intended words of common usage to be given their ordinary meanings."). The relevant dictionary definition of the word "designate" plainly requires some action by a designating party:

> "**4 a :** to decide upon : NOMINATE, DELEGATE, APPOINT; *esp* **:** to assign officially by executive or military authority <the operating agency last *designated* by the president> <the

tanks had been *designated* to exploit a breakthrough of the enemy's defenses —R. D. Gardner> **b :** to induct in a rank or position <the supreme council is *designated* as the highest organ of state power> <the duke had been *designated* as king of a puppet state> **c :** to choose and set apart (as by public will or in the process of government administration) <a successful *designating* petition places the name of the candidate on the primary ballot —*Bk. Of Civic Definitions*> <control dams *designated* for construction> <finally Queen Victoria was ask to ~ a site —B. K. Sandwell>

"* * * * *

"**syn** NAME, NOMINATE, ELECT, APPOINT: DESIGNATE may apply to choosing or detailing a person or group for a certain post by a person or group having power or right to choose <the following deputies were *designated* by the three ministers to carry on the council's work —*Americana Annual*> <the vice-chairman is elected from among the commissioners, and the president *designates* the chairman —*Current Biog.*>."

*Webster's Third New Int'l Dictionary* 612 (unabridged ed 2002).

Thus, as enacted by the legislature, ORS 243.672(1) provides that an unfair labor practice may be committed either by a public employer or by a person that has been named, nominated, elected, appointed, or assigned the position of representative of the public employer. By its terms, it covers no others.

To be sure, reading the statute as actually written gives it a narrower scope than the majority appears to desire. It leaves out individuals who have not been designated as representatives of a public employer but who might be perceived to be acting on behalf of a public employer. That may well be the case. But our job is to take a statute as we find it, not to rewrite it to conform with the policies that we suppose the legislature may have had in mind, but did not actually enact into law. *Wyers v. American Medical Response Northwest, Inc.*, 360 Or 211, 221, 377 P3d 570 (2016) ("We are obligated to take a statute as we find it.").

Even assuming for the sake of argument that we may ignore the reference to a public employer's "designated

representative" in ORS 243.672(1) and substitute the broader term "public employer representative" mentioned elsewhere in PECBA, the majority's reasoning still fails to conform to well-established principles of statutory construction.

As the majority notes, ORS 243.650(21) provides that the term "public employer representative" includes one who is "specifically designated" to represent the employer. The statute leaves open the possibility that others not specifically designated may also be included. Its phrasing reflects an obvious parallel to common-law principles of agency, with which we presume the legislature was familiar. *See, e.g.*, *State v. Ramos*, 358 Or 581, 596, 368 P3d 446 (2016) (we presume that the legislature is aware of existing common law); *Blachana, LLC v. Bureau of Labor and Industries*, 354 Or 676, 691, 318 P3d 735 (2014) (same). And, when common-law principles would otherwise apply, we do not assume that the legislature intended to alter them unless there is statutory text indicating such an intention. *See, e.g.*, *ODOT v. Alderwoods (Oregon), Inc.*, 358 Or 501, 524, 366 P3d 316 (2015) ("Nothing in the statutory text suggests that, by providing such a procedure, the legislature intended to alter the common law.").

In this case, common-law principles of apparent authority are well settled. There are essentially two categories of agents—those whose authority is actual and those whose authority is "apparent." *See* *Taylor v. Ramsay-Gerding Construction Co.*, 345 Or 403, 409, 196 P3d 532 (2008) ("Generally speaking, an agent can bind a principal only when that agent acts with actual or apparent authority."). ORS 243.650(21), in referring to those who are "specifically designated" to act as the employer's representative in collective bargaining and related matters, appears to capture the former type of agent. That leaves only the latter type, those whose authority is apparent, but not actual.

Under Oregon law, however, the liability of a principal for the acts of one with apparent authority is predicated on a showing that the principal engaged in some affirmative conduct that created the appearance of authority—that is, conduct that caused a third party reasonably to believe that the principal had consented to have the

apparent agent act on the principal's behalf. *See, e.g.*, [*Eads v. Borman*](), 351 Or 729, 736, 277 P3d 503 (2012) (apparent authority "can be created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter"). An agent's actions, by themselves, are not sufficient. *Taylor*, 345 Or at 410 ("An agent's actions, standing alone and without some action by the principal, cannot create authority to bind the principal.").

In this case, it is undisputed that the city took no action nor engaged in any conduct that created the appearance that Campbell had authority to speak for it on collective bargaining and related matters. In other words, even allowing for the majority's substitution of "public employer representative" for the statutory phrase "designated representative," there is no statutory basis for concluding that Campbell was such a public employer representative in this case.

In reaching its contrary conclusion, the majority dispenses with those general principles of agency law—in particular, the requirement that a principal take some action to clothe an agent with apparent authority—without citing any statutory wording that suggests the legislature intended to do so. Rather, it relies on federal court decisions interpreting the provisions of the NLRA setting out who may commit an unfair labor practice under that federal law. Here, the majority strays far from well-established principles of statutory construction.

Generally, when the Oregon legislature borrows statutory wording from another jurisdiction, we assume that, in the process, the legislature also borrows existing controlling case law interpreting that legislation. *Jones v. General Motors Corp.*, 325 Or 404, 418, 939 P2d 608 (1997) ("If the Oregon legislature adopts a statute or rule from another jurisdiction's legislation, we assume that the Oregon legislature also intended to adopt the construction of the legislation that the highest court of the other jurisdiction had rendered before adoption of the legislation in Oregon."). But it bears some emphasis that the critical prerequisite is that

the Oregon legislature borrowed statutory wording from the other jurisdiction. If the legislature, for example, borrows only part of the text of an enactment from another jurisdiction, then the rule applies only to the part of the text that the legislature actually borrowed, and not to other parts of the other jurisdiction's law.

*Taylor v. Baker*, 279 Or 139, 566 P2d 884 (1977), illustrates the point. At issue in that case was the proper construction of Oregon's summary judgment rule, some of which had been patterned after Rule 56 of the Federal Rules of Civil Procedure. One subsection of the federal rule—Rule 56(d)—the legislature had not adopted. This court concluded that it was obliged to give great weight to "federal cases interpreting those aspects of Rule 56, *other than subsection (d) thereof*, and decided prior to the enactment of the state's summary judgment statute." *Id.* at 142 n 2 (emphasis added); *see also Jones*, 325 Or at 418 (same). Thus, the court held that federal cases informed our interpretation of the provisions borrowed from the federal law, but not of the provisions that departed from the text of the federal rule.

Here, the majority disregards that settled rule of construction. The Oregon legislature may well have borrowed *parts* of PECBA from the NLRA: specifically, the provisions that define what constitutes an unfair labor practice. But it did not borrow every provision from the NLRA. *See Elvin v. OPEU*, 313 Or 165, 175 n 7, 832 P2d 36 (1992) (although similar in some respects, PECBA "is not identical to the NLRA"). Significantly, it did not borrow the definition of who may commit an unfair labor practice.

That comes as no surprise. The NLRA is a private sector labor statute and prohibits a private "employer" from engaging in any unfair labor practice. 29 USC § 158(a). As defined by the NLRA, the term "includes any person acting as an agent of an employer, directly or indirectly." 29 USC § 152(2). It disclaims ordinary agency requirements of express authorization or ratification. 29 USC § 152(13). Moreover, it expressly *excludes* public employers, such as the federal government, any state government, or any subdivision of state government. 29 USC § 152(2).

The Oregon legislature did not adopt those provisions of the NLRA in enacting PECBA, a public sector labor statute. In particular, in spelling out which individuals may engage in an unfair labor practice, the Oregon legislature rejected the phrasing of the NLRA that refers to "any person acting as an agent of an employer, directly or indirectly" and specified instead that such forbidden practices may only be committed by a public employer's "designated representative," a term that nowhere appears in the federal law. Moreover, the Oregon legislature declined to include the provision in the NLRA that disclaims the application of certain ordinary principles of agency law. In consequence, there is no textual connection between the state and federal statutes that would provide the basis for concluding that preexisting cases interpreting the federal law inform the meaning of the state law.

The majority nevertheless resorts to federal case law interpreting the NLRA for four reasons. None is availing.

First, the majority observes that, "[i]n many respects, PECBA was patterned after the NLRA," including parallel statements of policy and definitions of what constitutes an unfair labor practice. 360 Or at ___. That, however, is not how the borrowed-statute canon works. The justification for the canon is the idea that, the legislature having borrowed statutory text from another jurisdiction, it is fair to assume that the legislature was aware of controlling case law construing *that text. See, e.g., Lindell v. Kalugin*, 353 Or 338, 355, 297 P3d 1266 (2013) ("As a general rule, when the Oregon legislature borrows from a statute originating in another jurisdiction, there is a presumption that the legislature borrowed controlling case law interpreting the statute along with it."). In that light, it makes no sense to say that, because the Oregon legislature borrowed *some* text from a federal statute, we may look to federal case law construing provisions of the federal statute that the Oregon legislature chose *not* to adopt.

Second, the majority observes that this court has looked to federal case law interpreting the NLRA in a number of previous PECBA cases. 360 Or at ___. True enough. But the court did so only with respect to case law construing portions

of the NLRA that the Oregon legislature actually adopted. In *Elvin*, 313 Or at 165, for example, the court addressed whether the provision of PECBA codified at ORS 243.676(2)(c) authorized the Employment Relations Board to order refunds of unlawfully collected fair share payments. The court looked to federal NLRA cases construing "the provision from which ORS 243.676(2)(c) is derived." *Id.* at 178. Such cases are perfectly consistent with the borrowed-statute canon of construction. The majority's opinion in this case is not.

Third, in a footnote, 360 Or at ___, the majority insists that, in any event, there is the required textual connection between PECBA and the NLRA in that both statutes use the word "employer." It is certainly true that both state and federal statutes use the same word. But it is also beside the point, which is that the state and federal laws define that word differently. And it is precisely the definitional differences that undercut any reliance on the federal law to inform the meaning of PECBA.

Fourth, in the same footnote the majority offers the alternative argument that, under this court's opinion in *State v. Walker*, 356 Or 4, 23 n 9, 333 P3d 316 (2014), textual differences between state and federal statutes are no impediment to applying the borrowed-statute canon. With respect, the majority reads too much into that decision. In *Walker*, the court addressed the Oregon racketeering statute's definition of the term "enterprise," which was modeled after the federal statute's definition of the same term. The court noted that the Oregon definition altered "somewhat" the wording of the federal definition "to clarify the expansive scope of the term and thereby avoid interpretative issues that were arising in federal courts." *Id.* The slight textual differences, in other words, did not alter the substance of the definition that the Oregon legislature borrowed from the federal statute. The same cannot be said for the differences between the ways that PECBA and the NLRA treat the word "employer." As I have pointed out, there are significant differences between the ways that the state and federal law define the term. The two definitions, in fact, are inconsistent; among other things, the federal law expressly excludes public employers while the state law applies *only* to public employers. In short, there is simply no basis for looking to

federal case law construing the NLRA for guidance in interpreting the provisions of PECBA at issue in this case.

Even assuming for the sake of argument that it is appropriate to substitute the phrase "public employer representative" for the statutory term "designated representative" and that it is appropriate to look to federal case law to interpret that substituted phrase, the federal case law does not provide support for the conclusion that the majority draws from it. The majority relies on some broad statements in a number of federal court opinions, which the majority reads as dispensing with general principles of agency law in determining who has committed an unfair labor practice. The majority's reading of the federal case law, however, is mistaken.

As originally enacted, the NLRA defined an "employer" who could engage in an unfair labor practice to include "any person acting in the interest of an employer, directly or indirectly." 49 Stat 450 (1935). The question arose whether the law required express authorization or ratification for an employer to be liable for the unfair labor practice of an individual acting in its interest. The United States Supreme Court answered that question in the negative in *International Ass'n of Machinists, Tool and Die Makers Lodge No. 35 v. Labor Board*, 311 US 72, 80, 61 S Ct 83, 85 L Ed 50 (1940), and *H.J. Heinz Co. v. Labor Board*, 311 US 514, 521, 61 S Ct 320, 85 L Ed 309 (1941).

In response to those decisions, in 1947 Congress enacted amendments to the NLRA as part of what is known as the Taft-Hartley Act. Among other things, the amendments modified the definition of an "employer" to include "any person acting *as an agent* of an employer, directly or indirectly." 29 USC § 152(2) (emphasis added). It also, as I have noted earlier, specifically provided that, "[i]n determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 USC § 152(13). The latter amendment essentially codified the Supreme Court's holdings in *International Association of Machinists* and *Heinz*. Legislative history of the Taft-Hartley act makes clear that, in providing that actual authorization

or ratification is not required, Congress intended that ordinary common-law agency principles otherwise do apply. *See generally Local 1814, Intern. Longshoremen's Ass'n, AFL-CIO v. NLRB*, 735 F2d 1384, 1394 (DC Cir 1984) ("Beyond doubt, the legislative intent of this provision was to make the ordinary law of agency applicable to the attribution of individual acts to both employers and unions."); *NLRB v. International Longshoremen's and Warehousemen's Union, Local 10*, 283 F2d 558, 563 (9th Cir 1960) (noting that "Senator Taft, the life-force behind the bill as enacted, repeatedly remarked on the floor of the Senate that common law rules of agency were to govern the question of who acted for whom for purposes of determining culpability under the Act").

Since the enactment of the Taft-Hartley Act, the National Labor Relations Board has consistently turned to common-law agency principles in determining whether an employer has engaged in an unfair labor practice based on the actions of one of its employees. In fact, early decisions of the NLRB relied on the *Restatement of Agency* in expressly holding that apparent authority under the NLRA requires "written or spoken words or any other conduct of the principal" that causes a third person reasonably to believe that the agent has authority to act for that principal. *See, e.g.*, *Nevada Tank & Casing Co.*, 144 NLRB 123, 129 (1963) (quoting *Restatement of Agency* § 27). As the NLRB explained more recently, "[a]pparent authority is created through a manifestation by the principal to a third party that supplies a reasonable basis for the latter to believe that the principal has authorized the alleged agent to do the acts in question." *Dentech Corp.*, 294 NLRB 924, 925 (1989).[1]

---

[1] The NLRB's reliance on common-law agency principles of apparent authority is longstanding and continues down to the present. *See, e.g.*, *Pratt (Corrugated Logistics), LLC*, 360 NLRB No. 48 (2014) (labor relations consultant held out by employer as conduit for transmitting information to and from management held to be agent of employer); *Int'l Union, Security, Police & Fire Prof'ls of America*, 360 NLRB No 57 (2014) (union steward held to be union's agent because he handled grievances, represented employees in disciplinary meetings, and resolved disputes without union president's approval); *Snelling Personnel Services, Inc. Bill Mudd Electric Co.*, 37 NLRB AMR 2 (2002) (holding that "[u]nder the common law principles of agency and general and apparent authority," agent acted for employer); *Sterling Faucet Co.*, 203 NLRB 1031, 1038 (1973) (agents had apparent authority because they "were held out to the employees by the employer as its agents"); *Smith's Transfer Corp. of Staunton, Va.*, 162 NLRB 143, 157 (1966) ("[T]he respondent employer by acquiescing in, and encouraging, interrogation

Federal appeals courts have likewise looked to common-law principles of agency—which require actions on the part of the employer to clothe an employee with apparent authority—in determining whether a person reasonably could believe that an individual speaks for, or acts for, the employer. *See, e.g.*, *NLRB v. Georgetown Dress Co.*, 537 F2d 1239, 1244 (4th Cir 1976) ("Whether an agency relationship exists under the [NLRA] is to be determined under the general common law of agency."); *NLRB v. Birmingham Publishing Co.*, 262 F2d 2, 8 (5th Cir 1958) (employee speaks for employer "[i]f an employee * * * is clothed with the apparent authority to speak for the employer").[2]

---

and polling of the men * * * clothed these employees in the eyes of their fellow workers with the apparent authority to speak for the employer."). I am not aware of a single federal court decision holding that the board has erred in relying on those principles.

[2] The majority acknowledges that "some" courts so hold, but insists that others apply a broader test that disregards that restriction of common-law agency. The majority is mistaken about that. Nearly every federal circuit court has held that the NLRA incorporates common-law principles of apparent authority. *See, e.g.*, *Fleming Companies, Inc. v. NLRB*, 349 F3d 968, 973 (7th Cir 2003) ("To hold an employer liable, the individual who made the statement must act as an agent of the employer. An agent has apparent authority when an employer takes steps that would reasonably lead third persons to believe that the designated employee was authorized to take certain actions on behalf of the employer." (Internal citations omitted)); *Overnite Transp. Co. v. NLRB*, 140 F3d 259, 266 (DC Cir 1998) ("Apparent authority exists when the principal engages in conduct that, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." (Internal quotation marks omitted)); *BE&K Const. Co. v. NLRB*, 23 F3d 1459, 1466 (8th Cir 1994) ("Congress has set out the policy that the usual principles of agency apply in determining liability for unfair labor practices."); *NLRB v. Int'l Union of Electrical, Radio & Machine Workers, AFL-CIO, Local 745*, 759 F2d 533, 534 (6th Cir 1985) ("Agency may be found to exist on the basis of actual authority, ratified authority or apparent authority. In this case the union clothed the stewards with apparent authority."); *Laborers and Hod Carriers Local No. 341 v. NLRB*, 564 F2d 834, 839 (9th Cir 1977) ("Common law agency principles determination of this factual issue; therefore, implied or apparent authority is sufficient."); *NLRB v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO*, 467 F2d 1158, 1159 (2d Cir 1972) ("Common law rules of agency govern; authority may be implied or apparent, as well as express."); *United Steelworkers of America v. CCI Corp.*, 395 F2d 529, 532 (10th Cir 1968) (Taft-Hartley Act "provided that the actual fact of authorization or subsequent ratification would not be controlling of agency questions. This has been properly construed as opening the way for application of general rules of agency and particularly the rules of apparent authority."); *NLRB v. Mississippi Products*, 213 F2d 670, 673 (5th Cir 1954) ("[S]ince respondent clothed [an individual] with apparent authority to speak for it and did actually on one occasion use his voice to make an antiunion speech, it may fairly said to be responsible for his conduct." (Internal quotation marks omitted.)).

The cases on which the majority relies are not to the contrary. The majority does invoke some broadly worded phrases in several cases, which it takes to suggest that—contrary to the wording and legislative history of the Taft-Hartley Act and the weight of federal case law interpreting it—common-law agency principles are no longer relevant. Examined in proper context, however, those statements provide no support for the conclusion that the majority asserts.

For example, the majority cites *NLRB v. Hart Cotton Mills*, 190 F2d 964, 974 (4th Cir 1951), for the proposition that employer responsibility for acts of supervisory employees "is not determined by applying principles of agency or respondeat superior." 360 Or at ___. That case, however, was about the significance of an employer's lack of ratification of certain anti-union statements that had been made by one of its supervisors. The company argued that it was not responsible for those statements because they were contrary to its policy and had not been ratified by it. The court agreed with the employer. It began by noting that, in *Heinz*, the Supreme Court had concluded that express authority or ratification were not required. *Id.* at 974. It then went on to conclude that, nevertheless, "isolated statements by supervisors, contrary to the proven policy of the employer and neither authorized, encouraged, nor acquiesced in by him, do not constitute substantial evidence of" an unfair labor practice. *Id*. The decision thus offers no support for the majority's view that ordinary principles of apparent agency are no longer relevant.

For another example, the majority cites *Amalgamated Clothing Workers of America, AFL-CIO v. NLRB*, 371 F2d 740, 744 (1966), for the proposition that employer responsibility for violations of the NLRA "is not controlled by the refinements of the law of agency." 360 Or at ___. Again, however, the statement was made in refutation of an argument that the employer had not expressly authorized the actions or statements of certain individuals who had made anti-union statements. The court rejected the argument, noting that the individuals were involved directly in the company's affairs, spoke with employees about management expectations and employee grievances, and made hiring recommendations to the management. "In this

setting," the court explained, "responsibility under the Act is not controlled by refinements of the law of agency. The [c]ompany's silence may properly be taken by the Board as recognition or ratification" of the actions of the individuals at issue. 371 F2d at 744. The court said nothing about abandoning general principles of agency law that govern apparent authority.

The majority also cites a number of decisions holding that certain executive officers and management personnel may be held to speak for their employers in determining whether the employer committed an unfair labor practice. 360 Or at ___. Those decisions, however, are entirely consistent with the common-law agency principles that I have mentioned. Their rationale is that the companies for which those persons worked had given the executive officers and managers *individual authority* to set company business policies. *See generally Unfair Labor Practice, within National Labor Relations Act or Similar State Statute, Predicated upon Statements or Acts by Employees Not Expressly Authorized by Employer*, 146 ALR 1062, § II (1943) ("[I]t is well established that an employer is responsible for statements or acts of those executive officers whose duty it is to determine his general business policies, including his labor policy."). That only makes sense. When executive or management personnel have individual authority within a company to set company policies, an employee may reasonably believe that they also have authority to speak for the company as to labor matters.

For example, the majority cites *Morgan Precision Parts v. NLRB*, 444 F2d 1210, 1215 (5th Cir 1971), a case involving anti-union statements of the company's owner. Similarly, the majority relies on *Madison Brass Works, Inc. v. NLRB*, 381 F2d 854, 857 (7th Cir 1967), and, *NLRB v. Lightner Pub. Corp. of Illinois*, 113 F2d 621, 625 (7th Cir 1940), both of which involved a company's president. And it relies on *NLRB v. Jahn & Ollier Engraving Co.*, 123 F2d 589, 593 (7th Cir 1941), which involved executive officers of the company, as well as foremen whom the court found "did exercise some authority over employees and were in a strategic position to translate to their subordinates the policies and desires of the management." *Id.*

In this case, Campbell had no such individual authority to speak for the City of Lebanon. She had no authority to hire, fire, or discipline any city employee. She had no authority to participate as a member of the city's labor negotiating team.

Certainly, Campbell was a member of the City Council. In some cases, depending on the terms of the statute or charter that defines the authority of a member of a governing body, an individual member of a city council may have certain day-to-day management authority. *See, e.g.*, Portland City Code, ch. 3.06.010 (management of departments are assigned to individual members of the City Council). And, in such cases, an employee might have good reason to believe that such a council member speaks for the city on labor matters.

But that is not the case here. Under the terms of the Lebanon City Charter, Campbell had no individual authority at all. The only authority she possessed was to vote as a member of the council. Without a majority of the council concurring, her views had no force and effect at all, as a matter of law.

Under the reasoning of the very federal cases on which the majority relies, then, the conclusion should be that no reasonable person could believe that Campbell spoke for the city as to labor matters. The linchpin of those cases—the individual authority of the executive or management personnel—has no application to a multi-member governing body like the Lebanon City Council.

In that regard, it is worth noting that the majority has cited not one federal court or NLRB decision holding a company liable under the NLRA based on the actions of a single member of a multi-member body, such as a board of directors. I submit that there is a reason for that: Because individual members of such boards have no individual authority, there is no basis for an employee to believe that they speak for the company. Thus, even under the majority's test, the claim against the city in this case fails.

In short, the majority's opinion is contrary to settled law. It conjures a test not from the text of Oregon law, but

from a misreading of federal cases construing a provision of the NLRA that the Oregon legislature chose not to adopt. Moreover, the majority ignores the fact that, even under its test, the unauthorized actions of a single member of a multi-member governing body cannot amount to an unfair labor practice.

At bottom, the majority's decision is predicated on its view that the legislation must be read "expansively" to "broadly protect public employees' rights." 360 Or at ___. With respect, such appeals to general policy provide no justification for avoiding the terms of the statute that the legislature enacted into law. As this court cautioned in *Halperin v. Pitts*, 352 Or 482, 496, 287 P3d 1069 (2012), "we simply do not have authority to rewrite the terms of a statute to accomplish what we may suspect the legislature intended but did not actually enact into law." In my view, the statute should be interpreted and applied as written, without the gloss borrowed from a mistaken understanding of case law interpreting a portion of a federal statute that the Oregon legislature never adopted.

Balmer, C.J. and Brewer, J., join in this dissenting opinion.